# EXHIBIT D

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| DAVID V. MYERS and SHIVA Y. STEIN, derivatively on behalf of STARBUCKS CORPORATION,<br><br>          Plaintiffs,<br><br>   v.<br><br>TROY ALSTEAD, MARY N. DILLON, ROBERT M. GATES, MELLODY HOBSON, KEVIN R. JOHNSON, SCOTT MAW, JOSHUA COOPER RAMO, HOWARD SCHULTZ, JAMES G. SHENNAN, JR., CLARA SHIH, JAVIER G. TERUEL, MYRON E. ULLMAN, III, CRAIG E. WEATHERUP,<br><br>          Defendants,<br><br>and<br><br>STARBUCKS CORPORATION,<br><br>        Nominal Defendant. | No.: _____<br><br>**COMPLAINT FOR:**<br><br>**1. BREACH OF FIDUCIARY DUTIES; AND**<br>**2. UNJUST ENRICHMENT**<br><br><br>**Jury Trial Demanded** |

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 1

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiffs David V. Myers ("Myers") and Shiva Y. Stein ("Stein") (collectively, "Plaintiffs"), by and through their respective undersigned attorneys, hereby submit this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Starbucks Corporation ("Starbucks" or the "Company) against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breach of fiduciary duties from 2013 to the present (the "Relevant Period").

## NATURE OF THE ACTION

1.     Starbucks is a roaster and retailer of specialty coffee, tea beverages, and a variety of food items sold in company-operated retail stores around the world.

2.     On or about June 11, 2014, the European Commission (the "Commission") – the European Union's ("EU") executive arm – launched an in-depth investigation regarding Starbucks' corporate tax scheme within the EU and in the Netherlands in particular.[1] At the time, Starbucks maintained its regional headquarters in Amsterdam.     The investigation resulted from media allegations that despite reporting large profits in Europe to investors, Starbucks was paying unusually low tax rates to national tax authorities.     The investigation culminated with the Commission's finding in October 2015 that Starbucks was the recipient of illegal tax advantages and required the Netherlands to claw back €30 million in back taxes from it.[2]

3.     The Commission's investigation followed years of governmental and public scrutiny of Starbucks' complex tax structure in the EU.  For instance, beginning in November 2012, the United Kingdom called for a parliamentary inquiry into Starbucks after the news agency *Reuters*

---

[1] Press Release, Commission Investigates Transfer Pricing Arrangements on Corporate Taxation, http://europa.eu/rapid/press-release_IP-14-663_en.htm (last accessed July 21, 2016).

[2] Commission Decision on State Aid SA.38374 (2014/C ex 2014/NN) implemented by the Netherlands to Starbucks (Oct. 21, 2015).

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 2

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566  FAX 206.621.9686

reported on the low corporate taxes it paid there despite billions of pounds in sales.[3] Of particular interest to the Members of Parliament were the various tactics employed by Starbucks, as the parent company, to siphon profits from its European subsidiaries in order to lower the subsidiaries' taxable income. These tactics include: (1) charging subsidiaries royalties, as a percentage of earnings, for the benefit of using Starbucks' intellectual property ("IP"), and transferring those royalties to jurisdictions with very low tax on such IP; (2) the setting of "transfer prices" (discussed in detail below) of other goods, such as coffee beans, that subsidiaries would sell among themselves at above-market rates; and (3) setting high interest rates on intra-company loans the US Starbucks business would make to its UK subsidiary.

4.     Starbucks' tax avoidance scheme (which occurred under the defendants' direction and on their watch) was so effective there that, according to *Reuters*, between 2009 and 2012 Starbucks paid no corporate tax in the UK despite national sales of £1.2 billion over that same period.[4]

5.     On December 6, 2012, after public outcry and protests led to a decline in British sales, Starbucks made an unprecedented announcement that the Company would pay £10 million in UK corporate tax in both fiscal years of 2013 and 2014 regardless of profitability.[5]

6.     Despite admonition by the British parliament and a decline in public confidence, the defendants caused Starbucks to largely leave its tax strategies intact.

7.     Shortly thereafter, Starbucks' corporate tax arrangement in the Netherlands came under the scrutiny of Margrethe Vestager ("Ms. Vestager"), the European Commissioner for Competition, when accounts filed by one Starbucks' Amsterdam subsidiary showed that it had paid

---

[3] Reuters, Special Report: How Starbucks Avoids UK Taxes—
http://www.reuters.com/article/2012/10/15/us-britain-starbucks-tax-idUSBRE89E0EX20121015 (last accessed July 21, 2016).
[4] See fn. 3.

[5] The Guardian, Starbucks to Pay £20m in Tax Over Next Two Years—
https://www.theguardian.com/business/2012/dec/06/starbucks-to-pay-10m-corporation-tax (last accessed July 21, 2016).

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 3

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

1    only €2.6 million in corporate tax on €407 million in pretax profit. That is, Starbucks was paying a

2    corporate tax rate of less than *one percent*.[6]

3          8.      Then-chief financial officer ("CFO"), Troy Alstead ("Alstead"), explained that

4    Starbucks had secured an advance pricing agreement ("APA" or "tax ruling") with the Dutch tax

5    administration that allowed it to pay tax at a very low rate in that jurisdiction. An APA is an

6    agreement between a tax administration and a taxpayer on the application of tax law regarding

7    (future) transactions (*i.e.*, it determines the amount of profit that the taxpayer generates from its

8    activities that are taken into account in that tax jurisdiction). An APA determines, in advance of

9    intra-group transactions, an appropriate set of criteria for the determination of an arm's length

10   pricing for those transactions over a fixed period of time – in this case ten years, from October 2007

11   to December 31, 2017.

12          9.      In the Starbucks' APA, the Dutch tax administration accepted the transfer pricing

13   analysis proposed by Starbucks and allowed royalty payments to be deductible for corporate income

14   tax purposes.[7] Moreover, the APA enabled Starbucks to determine its corporate income tax liability

15   in the Netherlands for a period of ten years.

16         10.     On October 21, 2015, the Commission formally decided that Starbucks' corporate tax

17   structure violated EU laws.[8] The Commission found that Starbucks had utilized illegal selective tax

18   advantages which employed artificial and complex methods to minimize its tax liability. The

19   Commission went on to state that such a scheme, under the aegis of the Dutch tax administration,

20   constitutes illegal "state aid" in violation of the Treaty on the Functioning of the European Union by

21   letting Starbucks shift profits to other jurisdictions and pay lower tax rates there than available to

22   other companies in the same jurisdiction.

23

24   [6] Wall Street Journal, Huge Profit Stokes Concerns Over Starbucks's Tax Practices in Europe—
25   http://www.wsj.com/articles/starbuckss-tax-practices-draw-european-scrutiny-1428363189 (last
     accessed July 25, 2016).
26   [7] Commission Decision on State Aid SA.38374 (2014/C ex 2014/NN) implemented by the
     Netherlands to Starbucks, p. 7, ¶ 44 (Oct. 21, 2015).

27   [8] *See Id. generally.*

28   COMPLAINT FOR BREACH OF                 **BADGLEY MULLINS TURNER** PLLC
     FIDUCIARY DUTIES AND UNJUST                19929 Ballinger Way NE, Suite 200
     ENRICHMENT - 4                            Seattle, WA 98155
                                        TEL 206.621.6566 FAX 206.621.9686

11.     The Commission ordered the Netherlands to immediately recover the illegal aid up to €30 million, or $34 million, plus interest.  Any sums that remain unrecoverable from Starbucks Amsterdam were to be recovered from its parent company.

12.     As a result of the above, on or about August 13, 2015, plaintiff Stein issued a books and records demand letter pursuant to Chapter 23B.16.020 of the Washington Business Corporation Act requesting documents that would allow her counsel to investigate defendants' purported malfeasance.  On or about October 26, 2015, Starbucks, through its counsel, responded to Stein's books and records demand by producing 58 pages of responsive documents, including minutes of meetings, and associated materials.

13.     On December 2, 2015, plaintiff Myers, through his counsel, issued a pre-suit demand pursuant to Washington law on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company.  A true and correct copy of Mr. Myers' demand letter is attached hereto as **Exhibit A**.  On January 27, 2016, Stein likewise issued a pre-suit demand on the Board calling for similar action (together with Myers' demand letter, the "Demand").  A true and correct copy of Stein's demand letter is attached hereto as **Exhibit B**.

14.     In response to Plaintiffs' respective Demand, Lucy Lee Helm, executive vice president, general counsel & secretary of Starbucks ("Ms. Helm"), responded stating that the Demand was referred to the Board for its judgment as to how to proceed and how to respond.  The Board would first consider the Demand during its next regularly scheduled Board meeting on March 22, 2016.

15.     After discussing the Demand during the March 22, 2016 meeting, the Board decided to punt a decision on any action until its *next* regularly scheduled meeting on May 10-11, 2016.

16.     On or about May 24, 2016, Plaintiffs' respective counsel received a letter from Ms. Helm informing Plaintiffs' counsel that the Demand was being refused, and that the Board would not undertake any of the actions requested therein (the "Refusal").  A true and correct copy of the Refusal is attached hereto as **Exhibit C**.

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 5

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

1    17.    The Refusal was comprised of a one-sentence letter enclosing copies of a Board

2    resolution (the "Resolution") and associated materials relating and responding to the Demand.  The

3    first half of the Resolution summarized, in a perfunctory manner, the exchange of correspondence

4    between Myers, Stein, and Ms. Helm.  The Resolution then outlined a presentation given to the

5    Board regarding the Demand and law related thereto (the "Presentation" is attached hereto as part of

6    **Exhibit C**).  That Presentation was filled with abstract legal precepts, conclusory statements,

7    shallow descriptions of Starbucks' corporate tax structure in Europe, and the Commission's decision

8    to claw back taxes from the Company.  The Resolution concluded that the matters raised by the

9    Demand "do not demonstrate that any officers or directors of the Company have violated their duties

10   or obligations to the Company or its shareholders," that the allegations in the Demand "do not

11   demonstrate that any director's conduct constituted intentional misconduct or a knowing violation of

12   law," and that "there is no alleged conduct or decision by Company officers or directors that was not

13   a proper action and/or business judgment made in further of business and affairs of the Company."

14   18.    Conspicuously absent from the Refusal is any suggestion of an investigation into the

15   factual allegations in the Demand.  Among other things, the Refusal did not mention *any* interviews

16   the defendants conducted with Starbucks' employees responsible for instituting the Company's

17   European corporate tax structure or with the Commission who investigated the matter.  The Board

18   failed to review internal documents relating to its corporate tax structure, outside of Board and Audit

19   committee minutes and the Presentation, prior to reaching the conclusion that no breach occurred.

20   Moreover, the Board failed to consult with an outside, independent expert on the matter to evaluate

21   the legality of tax structure – even after the Commission announced a formal investigation into the

22   matter.

23   19.    As a result of the above, the Refusal was wrongful and issued in bad faith.  By way of

24   their conclusory Resolution and cover letter, the defendants have attempted to insulate their

25   investigation from any scrutiny, which is unreasonable.  Strikingly, the Resolution found that the

26   Demand did not contain facts to support any viable claim for breach of fiduciary duty, even though

27

28   COMPLAINT FOR BREACH OF
     FIDUCIARY DUTIES AND UNJUST
     ENRICHMENT - 6

the Commission concluded there were violations of EU law, and even though Starbucks UK made an unprecedented announcement pledging millions of pounds in "voluntary" tax payments to national tax authorities. The Board's sweeping conclusion that no breach of fiduciary duty occurred, when coupled with the Commission's ruling and Starbucks' UK's pledge to pay more taxes, creates reasonable doubt whether the Board's "investigation" was conducted reasonably and in good faith. The Board has merely recited the conclusion that refusing the Demand was proper, without sufficiently explaining how the conclusion was reached.

20.     Not only did the Refusal fail to mention *any* interviews with Starbucks' employees, but it is readily apparent that the Board did not interview any member of the Commission who would corroborate Plaintiffs' claims of wrongful conduct, or any member or representative of the UK's parliament. At a minimum, a reasonable investigation would include an interview with Ms. Vestager, or some other member or representative of the Commission with comparable knowledge of the Commission's investigation.

21.     The Board's complete disregard of the actual merits of the claims set forth in the Demand is improper and demonstrates the Board's lack of diligence and good faith.

22.     Thus, this shareholder derivative action should be allowed to proceed.

### JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) in that Plaintiffs and Defendants are citizens of different States and citizens of a foreign state are additional parties; and, the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

24.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 7

district by engaging in numerous activities and conducting business here, which had an effect in this district. Moreover, 28 U.S.C. § 1401 allows a stockholder filing a civil action on behalf of his or her corporation to prosecute it in any judicial district where the corporation might have sued the same defendants.

## THE PARTIES

25.     Plaintiff Myers is a current shareholder of Starbucks and has continuously held Starbucks stock since October 2013. Myers is a citizen of Alabama.

26.     Plaintiff Stein is also a current shareholder of Starbucks and has continuously held Starbucks stock since June 2014. Stein is a citizen of New York.

27.     Nominal defendant Starbucks is a Washington corporation with its headquarters located at 2401 Utah Avenue South, Seattle, Washington 98134. According to its public filings, Starbucks is a premier roaster, marketer and retailer of specialty coffee in the world, operating in 73 countries.

28.     Defendant Howard Schultz ("Schultz") was first named Chief Executive Officer ("CEO") of Starbucks in 1987. Since 2000, Schultz has been Chairman of the Board, and in 2008, Schultz resumed his role as CEO of the Company. Upon information and belief, defendant Schultz is a citizen of Washington.

29.     Defendant Alstead served as Chief Operating Officer ("COO") of Starbucks from February 2014 until March 2015. Between November 2008 and February 2014, Alstead served as CFO of Starbucks. Before that, Alstead served as Senior Vice President of Global Finance from October 2008. Upon information and belief, defendant Alstead is a citizen of Washington.

30.     Defendant Scott Maw ("Maw") has served as CFO of Starbucks since February 2014. Before that, Maw served as Vice President of Corporate Finance from 2012 through 2014, and Controller from 2011 through 2012. Upon information and belief, defendant Maw is a citizen of Washington.

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 8

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

1    31.    Defendant Kevin R. Johnson ("Johnson") has served as the President and COO of
2  Starbucks since 2015. Johnson has served as a Board member since March 2009. In addition,
3  defendant Johnson served as a member of the Board's Audit and Compliance Committee (the "Audit
4  Committee") during the Relevant Period. Upon information and belief, defendant Johnson is a
5  citizen of Washington.

6    32.    Defendant Mellody Hobson ("Hobson") has served as a Board member since
7  February 2005. In addition, defendant Hobson served as a member of the Audit Committee during
8  the Relevant Period. Upon information and belief, Hobson is a citizen of California.

9    33.    Defendant Javier G. Teruel ("Teruel") has served as a Board member since
10  September 2005. In addition, defendant Teruel served as a member of the Audit Committee during
11  the Relevant Period. Upon information and belief, Teruel is a citizen of Mexico.

12    34.    Defendant Craig E. Weatherup ("Weatherup") has served as a Board member since
13  February 1999. In addition, defendant Weatherup served as a member of the Audit Committee
14  during the Relevant Period. Upon information and belief, Weatherup is a citizen of Washington.

15    35.    Defendant Robert M. Gates ("Gates") has served as a Board member since May 2012.
16  Upon information and belief, Gates is a citizen of Virginia.

17    36.    Defendant Mary N. Dillon ("Dillon") has served as a Board member since January
18  2016. Upon information and belief, Dillon is a citizen of Illinois.

19    37.    Defendant Joshua Cooper Ramo ("Ramo") has served as a Board member since May
20  2011. Upon information and belief, Ramo is a citizen of Pennsylvania.

21    38.    Defendant James Shennan, Jr. ("Shennan") has served as a Board member since
22  2004. Upon information and belief, Shennan is a citizen of Canada.

23    39.    Defendant Clara Shih ("Shih") has served as a Board member since December 2011.
24  Upon information and belief, Shih is a citizen of California.

25    40.    Defendant Myron Ullman, III ("Ulman") has served as a Board member since
26  January 2003. Upon information and belief, Ulman is a citizen of Texas.

27

28

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

41. Collectively, defendants Schultz, Alstead, Maw, Johnson, Hobson, Teruel, Weatherup, Gates, Dillon, Ramo, Shennan, and Ulman shall be referred to herein as "Defendants."

42. Collectively, defendants Hobson, Gates, Ramo, Teruel and Weatherup shall be referred to herein as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

43. By reason of their positions as officers, directors, and/or fiduciaries of Starbucks and because of their ability to control the business and corporate affairs of Starbucks and its subsidiaries, Defendants owed Starbucks and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Starbucks and its subsidiaries in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Starbucks and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Starbucks and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44. Defendants, because of their positions of control and authority as directors and/or officers of Starbucks, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Starbucks, each of the Defendants had knowledge of material non-public information regarding the Company.

45. To discharge their duties, the officers and directors of Starbucks were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company and its subsidiaries. By virtue of such duties, the officers and directors of Starbucks were required to, among other things:

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 10

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

a. Exercise good faith to ensure that the affairs of the Company and its subsidiaries were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company and its subsidiaries were operated in a diligent, honest and prudent manner and complied with all applicable federal, foreign and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

d. Inform themselves of all material information reasonably available to them prior to making a business decision.

46.     Recognizing the importance of following the laws of the various countries in which the Company conducts its business, the Board, in general, and the Audit Committee, in particular, have specifically adopted numerous internal policies and procedures to ensure that the Company is purportedly run lawfully worldwide.  For instance, pursuant to the Audit Committee's Charter, in addition to being responsible for overseeing the disclosure of the Company's financial statements and overseeing its internal controls, its members are specifically responsible for overseeing the Company's "major risk exposures, including financial, operational, privacy, security, business continuity and legal and regulatory risks, the steps the Company has taken to monitor and control such exposures, and the Company's risk assessment and risk management policies; and regularly report to the Board the substance of such reviews and discussions."

47.     In addition, certain of the Defendants – including (but not necessarily limited to) defendants Schultz, Johnson, and Maw – were required to comply with the Company's "Code of Ethics for CEO, COO, CFO and Finance Leaders."  This Code of Ethics sets forth:

> In my financial leadership role with Starbucks Coffee Company, I recognize that I hold an important and elevated role in corporate governance. I am charged with

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

ensuring that stakeholders' interests are appropriately balanced, protected and preserved. Accordingly, this Code provides principles to which I am expected to adhere.

To the best of my knowledge and ability, in executing my job responsibilities:

1. I act with honesty and integrity, avoiding actual or apparent conflicts of interest.

2. I provide internal and external constituents with appropriate and objective information that is full, fair, accurate, timely and understandable.

3. I comply with all applicable governmental laws, rules and regulations, and other appropriate private and public regulatory agencies' requirements. I ensure the Company's corporate books and records are maintained with accuracy and integrity.

4. I act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing my independent judgment to be compromised.

5. I respect the confidentiality of information acquired in the course of my work except when authorized or otherwise legally obligated to disclose. I will not use confidential information acquired in the course of my work for personal advantage.

6. I proactively promote ethical behavior as a responsible partner among others in my work environment. I understand my accountability for adhering to this code and my responsibility to report violations of this code, including concerns regarding accounting and internal controls matters, to the corporate compliance officer or other appropriate individuals in accordance with Starbucks Standards of Business Conduct.

7. I exercise responsible stewardship over company assets and resources.

## SUBSTANTIVE ALLEGATIONS

### Starbucks' Purposefully Complicated EU Corporate Tax Structure

48.     According to its 2015 Form 10-K filing with the United States Securities and Exchange Commission ("SEC"), Starbucks is a premier roaster, marketer and retailer of specialty coffee in the world, operating in 73 countries. The Company operates in four segments: Americas; Europe, Middle East, and Africa ("EMEA"); China/Asia Pacific; and Channel Development. The Company's presence in the EU is included in the EMEA segment.

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 12

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

49.     During the Relevant Period, Starbucks EMEA was headquartered in the Netherlands under the entity Starbucks Coffee EMEA BV ("SCE").[9]  A separate entity, which is a subsidiary of the Company, is also based in the Netherlands, named Starbucks Manufacturing EMEA BV ("SME").  SCE and SME are collectively referred to as the Dutch Subsidiaries.  SME is in charge of all coffee bean roasting and supplies all retailers in Europe with roasted coffee beans.  A third entity, Starbucks Coffee Trading Company ("Swiss Subsidiary"), is based in Switzerland and supplies Starbucks manufacturers with green coffee beans.

50.     Although it is unclear from public records or Starbucks' document production, at some point, SCE began paying a licensing fee to yet another subsidiary, Alki LP, which was organized under the laws of the UK.[10]  More than the other entities, Alki LP was shrouded in mystery. As the Company described it, REDACTED - TO BE FILED UNDER SEAL

51.     Aside from these three entities, several others were established in various countries in order to manage operations domestically.[12]  This complex and opaque business structure helps Starbuck insulate its corporate tax scheme from public or regulatory scrutiny.

**Starbucks' Aggressive Tax Avoidance Schemes Lead to Parliamentary Inquiry**

52.     Starbucks' troubles with tax authorities within the EU came to light on or about October 15, 2012, when *Reuters* ran a special report on how Starbucks avoided paying taxes in the UK.[13]  That report stated that between 1998 and 2012, Starbucks paid a mere £8.6 million on sales of

---

[9] REDACTED - TO BE FILED UNDER SEAL

[10] REDACTED - TO BE FILED UNDER SEAL

[11] REDACTED - TO BE FILED UNDER SEAL

[12] REDACTED - TO BE FILED UNDER SEAL

[13] Reuters, Special Report: How Starbucks Avoids UK Taxes—
http://www.reuters.com/article/2012/10/15/us-britain-starbucks-tax-idUSBRE89E0EX20121015
(last accessed July 21, 2016).

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

1  over £3 billion in the UK. By comparison, McDonalds had a tax bill of over £80 million on £3.6

2  billion in UK sales.

3       53.   *Reuters* indicated that for three years (from 2009 to 2012), Starbucks reported no

4  profit in the UK, but in transcripts of investor and analyst calls would regularly talk about the UK

5  business as "profitable."[14]

6       54.   Public outrage was swift – especially in the context of tight national budgets and

7  economic stagnation in the EU. Less than a month after the initial press reports were published, on

8  November 12, 2012, the UK's parliament called Alstead to appear for a parliamentary inquiry before

9  the Public Accounts Committee regarding Starbucks' corporate tax scheme in the UK, and in the EU

10  in general. As Margaret Hodge, the Member of Parliament who chaired the PAC, stated, the purpose

11  of the session was "…to understand why [Starbucks doesn't] pay the corporation tax that it appears,

12  on the facts, is due."[15]

13                 **Defendants' Profit Shifting Tactics to Aggressively Avoid Taxes**

14       55.   The parliamentary inquiry focused on three major tactics employed by Starbucks to

15  siphon profits from its UK subsidiary, thus minimizing its tax burden there, and shifting those profits

16  elsewhere. The three tactics included: (1) charging subsidiaries royalties, as a percentage of

17  earnings, for the benefit of using Starbucks' intellectual property ("IP"), and transferring those

18  royalties to jurisdictions with low tax rates on such IP payments; (2) the setting of transfer prices of

19  other goods, such as coffee beans, that subsidiaries would sell among themselves at above-market

20  rates; and, (3) setting high interest rates on intra-company loans the US Starbucks business would

21  make to its UK subsidiary.[16]

22

23

---

24  [14] *Id.*

25  [15] Minutes of Evidence before the Public Accounts Committee—
http://www.publications.parliament.uk/pa/cm201213/cmselect/cmpubacc/716/121112.htm (last
26  accessed July 21, 2016).

27  [16] *Id.*

28  COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 14

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

56.     The members of the PAC questioned Alstead over the 6% royalty fee its UK subsidiary was paying to the Dutch subsidiary, SCE, noting that Starbucks had recently negotiated that royalty fee down to 4.7 % with the UK's tax authority, Her Majesty's Revenue & Customs ("HMRC").[17]  Although Alstead was unable to explain how Starbucks' calculated the royalty percentage fee, Ms. Hodge offered it was based on "what you think you can get away with" in any given jurisdiction. Eventually, Alstead revealed that Starbucks' APA with the Dutch government (discussed in greater detail below) allowed it to pay "a very low tax rate" on royalties received there.[18]

57.     Next, the inquiry turned to payments made to Starbucks' Swiss Subsidiary. The Swiss Subsidiary purchases green coffee beans then sells them at a 20% mark-up to Starbucks' roasting manufacturers, despite the fact that the coffee beans never physically pass through Switzerland.[19]  The Swiss subsidiary sells green coffee beans to all Starbucks' manufacturers around the world at that same mark-up rate.  Starbucks' reason for basing all its coffee bean purchases in Switzerland is that country offers REDACTED - TO BE FILED UNDER SEAL  As a result, under Defendants' direction and on their watch, Starbucks effectively charges a 20% mark-up on each cup of coffee it sells, then receives the additional benefit of paying a low tax rate by transferring that profit to another jurisdiction other than where that cup of coffee is sold.

---

[17] REDACTED - TO BE FILED UNDER SEAL

[18] Minutes of Evidence before the Public Accounts Committee—
http://www.publications.parliament.uk/pa/cm201213/cmselect/cmpubacc/716/121112.htm (last accessed July 21, 2016).

[19] *Id.*

[20] REDACTED - TO BE FILED UNDER SEAL

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566  FAX 206.621.9686

58.     Such transaction prices charged between subsidiaries which are wholly-owned by the same parent are referred to as "transfer pricing."  Transfer pricing influences the allocation of taxable profit between subsidiaries of a group located in different countries.  As a result, tax authorities give high scrutiny to such transactions.[21]  Transfer prices must be set at arm's-length, that is, at the same price a seller would charge for any third-party buyer.  Otherwise, an inference of profit-shifting results.

59.     Finally, the inquiry asked Alstead about the interest rates charged on loans made by the US Starbucks business to its UK subsidiary noting that the interest rate, at approximately 5%, was above-market rates.  This high interest rate further facilitates the manipulating of profits generated in one jurisdiction into another.

60.     Succumbing to public and political pressure regarding its tax scheme, on December 6, 2012, Defendants caused Starbucks to announce at the London Chamber of Commerce that the Company would voluntarily pay £10 million each year for 2013 and 2014 regardless of profitability in the country – meaning that the Company would pay more than required under British tax law.[22] Defendants also caused Starbucks to promise to move its European headquarters to London from the Netherlands (while maintaining its manufacturing operations in the latter) and pay more taxes in the UK as a result.[23]

61.     However, despite Defendants' efforts to ameliorate the Company's corporate image, after 16 years of consistent strong growth in the UK, sales for Starbucks' UK subsidiary fell

---

[21] REDACTED - TO BE FILED UNDER SEAL

[22] Reuters, Starbucks Bows to Pressure on UK Tax, http://uk.reuters.com/article/uk-starbucks-idUKBRE8B518K20121206 (last accessed July 21, 2016).

[23] REDACTED - TO BE FILED UNDER SEAL

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 16

1  approximately £14 million in the year end of September 2013, as a result of public criticism and

2  boycotts.[24]

3                **The European Commission Finds Starbucks' Tax Schemes Are Illegal**

4          62.      As early as July 30, 2013, the Commission began a preliminary investigation into

5  Starbucks' corporate tax structure and its APA with the Netherlands.    During its preliminary

6  investigation, the Commission sought information and documents from the Dutch tax authorities

7  regarding its APA with Starbucks' European manufacturing arm, SME.   The investigation centered

8  on whether the tax rulings, or APA, by Dutch tax authorities regarding SME constitute illegal state

9  aid within the meaning of Article 107(1) of the Treaty on the Functioning of the European Union,

10  which reads: "Save as otherwise provided in the Treaties, any aid granted by a Member State or

11  through State resources in any form whatsoever which distorts or threatens to distort competition by

12  favouring certain undertakings or the production of certain goods shall, in so far as it affects trade

13  between Member States, be incompatible with the internal market."    Throughout this time,

14  Defendants caused Starbucks to continue the illicit tax scheme.

15          63.      On June 11, 2014, the Commission announced via a press release that it had opened a

16  formal, in-depth investigation into the corporate tax structure of Starbucks in the Netherlands

17  following media reports of significant tax reductions by way of tax agreements with national tax

18  authorities.[25]   In that press release, Commission Vice President in charge of competition policy

19  Joaquin Almunia said, "Under the EU's state aid rules, national authorities cannot take measures

20  allowing certain companies to pay less tax than they should if the tax rules of the Member State were

21  applied in a fair and non-discriminatory way."

22          64.      Selective tax advantages may amount to illegal state aid.

23

24  _____

25  [24] Reuters, Starbucks Suffers First UK Sales Drop after Tax Criticism,
    http://uk.reuters.com/article/uk-starbuckstaxbritain-idUKBREA3N0X020140424 (last accessed July
    21, 2016).
26  [25] Press Release, Commission Investigates Transfer Pricing Arrangements on Corporate Taxation,
    http://europa.eu/rapid/press-release_IP-14-663_en.htm (last accessed July 21, 2016).
27

28  COMPLAINT FOR BREACH OF                          **BADGLEY MULLINS TURNER** PLLC
    FIDUCIARY DUTIES AND UNJUST                      19929 Ballinger Way NE, Suite 200
    ENRICHMENT - 17                                  Seattle, WA 98155
                                                     TEL 206.621.6566  FAX 206.621.9686

65.    Tax rulings by national tax authorities, such as Starbucks' APA with the Dutch government, are not *per se* illegal.  They are often used to confirm transfer pricing arrangements for commercial transactions of goods and services between subsidiaries of the same group.  However, if tax authorities, when accepting the calculation of taxable basis proposed by a company requesting a tax ruling, do not insist on remuneration of a subsidiary on market terms, it could constitute illegal state aid.  Defendants were aware or should have been aware that Starbucks' APA was improper because they were put on notice by the parliamentary inquiry in the UK.  Indeed, their internal documents show they were aware of the potential for regulatory scrutiny.[26]

66.    On October 21, 2015, the Commission issued a decision finding that Starbucks' APA with the Dutch tax authorities artificially lowered taxed paid by its subsidiary in two ways: (1) by paying a substantial royalty fee to another Starbucks' subsidiary that was not justified because it did not adequately reflect market value; and (2) by paying an inflated price for green coffee beans to its Swiss subsidiary.[27]  The decision found such tactics to be illegal state aid that gave Starbucks an unfair competitive advantage over other companies that are taxed on their actual profits.

67.    The Netherlands was ordered to recover up to €30 million from the Dutch subsidiary; whatever could not be recovered from that entity was to be recovered from its parent company.[28]

68.    The Commission's decision has been appealed to the European Court of Justice where it is currently pending.

### Starbucks' False and Misleading Statements

69.    Due to its illegal tax avoidance scheme, the Forms 10-K Defendants caused the Company to file with the SEC since 2008 have been false and misleading.

---

[26] REDACTED - TO BE FILED UNDER SEAL

[27] Commission Decision on State Aid SA.38374 (2014/C ex 2014/NN) implemented by the Netherlands to Starbucks, p. 7, ¶ 44 (Oct. 21, 2015).

[28] *Id.*

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 18

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

| Fiscal Year Ended | Sep 28, 2014 | Sep 29, 2013 | Sep 30, 2012 |
|---|---|---|---|
| Net revenues: | | | |
| Company-operated stores | $ 12,977.9 | $ 11,793.2 | $ 10,534.5 |
| Licensed stores | 1,588.6 | 1,360.5 | 1,210.3 |
| CPG, foodservice and other | 1,881.3 | 1,713.1 | 1,532.0 |
| Total net revenues | 16,447.8 | 14,866.8 | 13,276.8 |
| Cost of sales including occupancy costs | 6,858.8 | 6,382.3 | 5,813.3 |
| Store operating expenses | 4,638.2 | 4,286.1 | 3,918.1 |
| Other operating expenses | 457.3 | 431.8 | 407.2 |
| Depreciation and amortization expenses | 709.6 | 621.4 | 550.3 |
| General and administrative expenses | 991.3 | 937.9 | 801.2 |
| Litigation charge/(credit) | (20.2) | 2,784.1 | |
| Total operating expenses | 13,635.0 | 15,443.6 | 11,490.1 |
| Income from equity investees | 268.3 | 251.4 | 210.7 |
| Operating income/(loss) | 3,081.1 | (325.4) | 1,997.4 |
| Interest income and other, net | 142.7 | 123.6 | 94.4 |
| Interest expense | (64.1) | (28.1) | (32.7) |
| Earnings/(loss) before income taxes | 3,159.7 | (229.9) | 2,059.1 |
| Income tax expense/(benefit) | 1,092.0 | (238.7) | 674.4 |
| Net earnings including noncontrolling interests | 2,067.7 | 8.8 | 1,384.7 |
| Net earnings/(loss) attributable to noncontrolling interests | (0.4) | 0.5 | 0.9 |
| Net earnings attributable to Starbucks | $ 2,068.1 | $ 8.3 | $ 1,383.8 |
| Earnings per share — basic | $ 2.75 | $ 0.01 | $ 1.83 |
| Earnings per share — diluted | $ 2.71 | $ 0.01 | $ 1.79 |
| Weighted average shares outstanding: | | | |
| Basic | 753.1 | 749.3 | 754.4 |
| Diluted | 763.1 | 762.3 | 773.0 |

70.     Since 2008, taxes paid by its Dutch subsidiary were found to be short by €30 million, or approximately $34 million. Accordingly, Starbucks' disclosures regarding foreign income taxes paid were false misleading.

71.     In addition, Defendants failed to disclose the existence of an investigation into its tax structure in the EU. Despite the fact that a parliamentary inquiry was called in the UK in November 2012, or that a formal investigation was launched by the Commission in June 2014, Defendants failed to disclose the governmental investigations until recently.

72.     By way of example, the Company's 2014 Annual Report on Form 10-K (the "2014 10-K") contained the following information regarding the Company's earnings and tax payments in fiscal years 2014, 2013 and 2012:

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 19

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

\*　　\*　　\*

### Note 13:　Income Taxes

Components of earnings/(loss) before income taxes *(in millions)*:

| Fiscal Year Ended | Sep 28, 2014 | Sep 29, 2013 | | | Sep 30, 2012 |
| --- | --- | --- | --- | --- | --- |
| | | Total | Litigation charge | All Other | |
| United States | $ 2,572.4 | $ (674.0) | $ (2,784.1) | $ 2,110.1 | $ 1,679.6 |
| Foreign | 587.3 | 444.1 | — | 444.1 | 379.5 |
| Total earnings/(loss) before income taxes | $ 3,159.7 | $ (229.9) | $ (2,784.1) | 2,554.2 | $ 2,059.1 |

Provision/(benefit) for income taxes *(in millions)*:

| Fiscal Year Ended | Sep 28, 2014 | Sep 29, 2013 | | | Sep 30, 2012 |
| --- | --- | --- | --- | --- | --- |
| | | Total | Litigation charge | All Other | |
| Current taxes: | | | | | |
| US federal | $ 822.7 | $ 616.6 | $ — | $ 616.6 | $ 466.0 |
| US state and local | 132.9 | 93.8 | — | 93.8 | 79.9 |
| Foreign | 128.8 | 95.9 | — | 95.9 | 76.8 |
| Total current taxes | 1,084.4 | 806.3 | — | 806.3 | 622.7 |
| Deferred taxes: | | | | | |
| US federal | 12.0 | (898.8) | (922.3) | 23.5 | 49.2 |
| US state and local | (4.9) | (144.0) | (148.7) | 4.7 | (0.7) |
| Foreign | 0.5 | (2.2) | — | (2.2) | 3.2 |
| Total deferred taxes | 7.6 | (1,045.0) | (1,071.0) | 26.0 | 51.7 |
| Total income tax expense/(benefit) | $ 1,092.0 | $ (238.7) | $ (1,071.0) | 832.3 | $ 674.4 |

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 20

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566  FAX 206.621.9686

73.     In addition, the 2014 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Schultz and Maw.    The SOX Certifications, which attested to the adequacy of the Company's internal controls, set forth:

I, [Howard Schultz/Scott Maw], certify that:

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended September 28, 2014 of Starbucks Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566  FAX 206.621.9686

quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

In connection with the Annual Report of Starbucks Corporation ("Starbucks") on Form 10-K for the fiscal year ended September 28, 2014, as filed with the Securities and Exchange Commission on November 14, 2014 (the "Report"), Howard Schultz, chairman, president and chief executive officer, and Scott Maw, executive vice president, chief financial officer of Starbucks, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Starbucks.

74.     Defendants failed to disclose the Commission's investigation or decision until the filing of the Company's Form 10-K for the fiscal year ending in September 27, 2015, wherein Defendants acknowledged past taxes of up to €30 million would be recovered by the Netherlands.

75.     As a result of its inaccurate statements regarding its tax liability in Europe, and its failure to disclose an on-going investigation to investors, Defendants' statements were false and misleading when made.

76.     As a result of the above, Starbucks has been damaged.

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 22

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

77.     Plaintiffs bring this action derivatively in the right and for the benefit of Starbucks to redress the breaches of fiduciary duty and other violations of law by Defendants.

78.     Plaintiffs will adequately and fairly represent the interests of Starbucks and its shareholders in enforcing and prosecuting its rights.

79.     As a result of the actions set forth above, on August 13, 2015, plaintiff Stein issued a books and records demand letter in order to investigate misconduct by the Board.  On December 2015, and January 2016, Plaintiffs separately issued demand letters pursuant to Washington law on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company.  *See* **Exhibits A & B**.

80.     On or about May 24, 2016, Plaintiffs' respective counsel received the Refusal from Ms. Helm informing Plaintiffs' counsel that the Demand was being refused, and that the Board would not undertake any of the actions requested therein.  *See* **Exhibit C**.

81.     As an initial matter, the Refusal (which included a May 11, 2016 Board resolution) confirmed that the only "report" created was the Presentation, a perfunctory, bullet-pointed, PowerPoint slideshow that contained virtually no substance, and described by Defendants as a "written presentation."  While boards are admittedly afforded wide latitude in how they conduct their investigation, one thing that is clear is that they are not entitled to insulate their investigation from scrutiny by concealing the substantive reasons for refusing a shareholder demand.  Defendants cannot insulate their investigation from scrutiny by employing bare-boned PowerPoint presentations devoid of substance to achieve the same star chamber results of boards that refuse to produce a formal report.  In doing so, Plaintiffs are left in the dark as to the true nature and substance of the board's investigation.  According to documents included with the Refusal, Defendants created the Presentation that consisted of slides, all of which were comprised of non-substantive bullet-points. This is the functional equivalent of refusing to produce a report and should be viewed for what it is –

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 23

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

1  an attempt by Defendants to unreasonably insulate their "investigation" from scrutiny by the

2  Plaintiffs and the Court.

3  82.  Moreover, the materials included with the Refusal confirm that no investigation by

4  the Board (or any Board committee or Company individual or entity) actually took place.  The

5  Presentation states in no uncertain terms that "if the Board concludes that the shareholder demands

6  should be accepted, in whole or part, the Board could then: undertake an independent internal

7  investigation into possible violations of EU, US and Washington tax laws by members of the Board

8  and management."  Since the Board concluded that the Demand should not be accepted, it did not

9  undertake an investigation.  In essence, the Board investigated whether there should be an

10  investigation, and then declined to conduct an actual investigation.  This flies directly in the face of

11  Washington law requiring the commencement of an investigation into the allegations raised in a

12  shareholder demand.  Moreover, the Board failed to consult with an outside, independent expert on

13  the matter to evaluate the legality of the tax structure—even after the Commission announced a

14  formal investigation into the matter.

15  83.  The Refusal (and specifically the Board resolution of May 11, 2016) confidently

16  stated that the Board determined that the Demand did not demonstrate that any director's conduct

17  constituted intentional misconduct or knowing violation of law; that there was no alleged conduct or

18  decision by Company officers or directors that was not a proper action and/or business judgment

19  made in furtherance of the business and affairs of the Company; and that there was no merit to

20  suggestions made in the Demand that claims should be made by the Company against Company

21  officers and directors relating to matters raised in the Demand.  Yet mere months earlier, the

22  Commission found and explicitly stated that Starbucks had utilized illegal selective tax advantages

23  which employed artificial and complex methods.  Given this fact, declining to conduct a bona-fide

24  investigation into the allegations made in the Demand is clearly a decision made in bad faith and not

25  protected by the business judgment rule.

26

27

28  COMPLAINT FOR BREACH OF
     FIDUCIARY DUTIES AND UNJUST
     ENRICHMENT - 24

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566  FAX 206.621.9686

84.     The Refusal failed to mention any interviews conducted with Starbucks' employees to investigate the issues surrounding its corporate structures in Europe. It is also readily apparent that the Board did not interview any member of the Commission who would corroborate Plaintiffs' claims of wrongful conduct, or any member of the UK's parliament. At a minimum, a reasonable investigation would include an interview with Ms. Vestager, or some other member of the Commission with comparable knowledge of the Commission's investigation.

85.     The Board's failure to even attempt to speak with any individual who participated in the Commission's investigation raises questions about the diligence with which the Board pursued its investigation. At a minimum, it demonstrates that the internal investigation—to the extent that there was one—was restricted in scope, perfunctory, and half-hearted.

86.     Finally, the so-called "investigation" was flawed because the Board failed to hire independent counsel. Rather, the Company engaged Barry Kaplan of Wilson Sonsini Goodrich & Rosati, who is described in the Refusal as "the Company's outside counsel". The documents included with the Refusal state that Mr. Kaplan was present at the March 22, 2016 Board meeting to answer questions from Board members. There is no indication whatsoever that independent counsel—or even outside counsel—took part in the so-called "investigation" of whether the Demand should be investigated. Indeed, Plaintiffs' counsel was never contacted by independent counsel for Defendants (and throughout the process was only contacted by the Company's general counsel). Defendants' non-substantive and perfunctory Refusal, combined with their non-substantive and perfunctory Presentation, all of which was done with the aid of non-independent counsel (or no outside counsel at all), renders their conduct grossly negligent.

87.     Clearly, the Board's failure to conduct a bona-fide investigation into the allegations raised in the Demand, along with its complete disregard of the actual merits of the claims set forth in the Demand and prejudgment of the merits of the claims set forth in the Demand, is improper and demonstrates the Board's lack of diligence and good faith. The entire "process" was procedurally deficient. The Board's abdication of its duty to investigate the Demand was not reasonable, and was

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 25

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

1  a decision made in bad faith, and is not entitled to the protections of the business judgment rule.

2  Thus, Plaintiffs have been left with no other recourse than filing this Action, and given the wrongful,

3  bad-faith refusal of the Demand, this Action must be allowed to proceed.

4                                      **COUNT I**

5          **AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**

6          88.     Plaintiffs incorporate by reference and reallege each and every allegation contained

7  above, as though fully set forth herein.

8          89.     Defendants owed and owe Starbucks fiduciary obligations. By reason of their

9  fiduciary relationships, Defendants specifically owed and owe Starbucks the highest obligation of

10  good faith, fair dealing, and loyalty.

11          90.     Defendants had a fiduciary duty to ensure that the Company and its subsidiaries were

12  operated in a diligent, honest, and prudent manner and complied with all applicable international,

13  federal, and state laws, rules, regulations and requirements, and all contractual obligations, including

14  acting only within the scope of its legal authority, and when put on notice of problems with the

15  Company's and/or its subsidiaries' business practices and operations, exercise good faith in taking

16  appropriate action to correct the misconduct and prevent its recurrence.

17          91.     Defendants, and each of them, violated and breached their fiduciary duties of care,

18  loyalty, reasonable inquiry, oversight, good faith and supervision.

19          92.     As a direct and proximate result of Defendants' failure to perform their fiduciary

20  obligations, Starbucks has sustained significant damages, not only monetarily, but also to its

21  corporate image and goodwill.

22          93.     As alleged herein, each of the Defendants (and particularly the Audit Committee

23  Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the

24  Company's financial statements were prepared in accordance with GAAP or OECD guidelines, and

25  when put on notice of problems with the Company's business practices with regards to tax

26

27

28  COMPLAINT FOR BREACH OF
     FIDUCIARY DUTIES AND UNJUST
     ENRICHMENT - 26

1 structures, exercise good faith in taking appropriate action to correct the misconduct and prevent its

2 recurrence.

3      94.    Defendants willfully ignored the obvious and pervasive problems with Starbucks'

4 corporate tax structures in the EU and failed to make a good faith effort to correct these problems or

5 prevent their recurrence.

6      95.    As alleged in detail herein, each of the Defendants (and particularly the Audit

7 Committee Defendants) had a duty to ensure that Starbucks disseminated accurate, truthful and

8 complete information to its shareholders.

9      96.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing

10 or allowing the Company to disseminate to Starbucks' shareholders materially misleading and

11 inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other

12 public statements and disclosures as detailed herein. Among these was Defendants' failure to advise

13 Starbucks shareholders of the ongoing investigation by the Commission and other misleading

14 information regarding its tax burden in Europe. These actions could not have been a good faith

15 exercise of prudent business judgment.

16      97.    As alleged in detail herein, each of the Defendants had a fiduciary duty to follow all

17 applicable laws in carrying out their functions within the Company. That includes following tax law

18 of relevant jurisdictions and paying taxes as required.

19      98.    Defendants breached their fiduciary duties of care and loyalty when they created

20 artificial and illegal tax structures that aggressively avoided paying taxes in the EU. Such illegal

21 behavior could not have been a good faith exercise of prudent business judgment.

22      99.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary

23 duties, the Company has suffered significant damages, as alleged herein.

24      100.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

25      101.   Plaintiffs, on behalf of Starbucks, have no adequate remedy at law.

26

## COUNT II
## AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

27

28

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 27

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566 FAX 206.621.9686

1    102.    Plaintiffs incorporate by reference and reallege each and every allegation of the

2    Complaint set forth above, as though fully set forth herein.

3    103.    By their wrongful acts and omissions, Defendants were unjustly enriched at the

4    expense of and to the detriment of Starbucks.

5    104.    Plaintiffs, as a shareholders and representatives of Starbucks, seek restitution from

6    these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits

7    and other compensation obtained by these Defendants, and each of them, from their wrongful

8    conduct and fiduciary breaches.

9                                    **PRAYER FOR RELIEF**

10    WHEREFORE, Plaintiffs demand judgment as follows:

11    A.    Against all Defendants and in favor of the Company for the amount of damages

12    sustained by the Company as a result of Defendants' breaches of fiduciary duties;

13    B.    Directing Starbucks to take all necessary actions to reform and improve its corporate

14    governance and internal procedures to comply with applicable laws and to protect the Company and

15    its shareholders from a repeat of the damaging events described herein, including, but not limited to,

16    putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or

17    Articles of Incorporation and taking such other action as may be necessary to place before

18    shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop

19    and implement procedures for greater shareholder input into the policies and guidelines of the Board;

20    C.    Awarding to Starbucks restitution from Defendants, and each of them, and ordering

21    disgorgement of all profits, benefits and other compensation obtained by the Defendants;

22    D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable

23    attorneys' fees, accountants' and experts' fees, costs, and expenses; and

24    E.    Granting such other and further relief as the Court deems just and proper.

25                                    **JURY DEMAND**

26    Plaintiffs demand a trial by jury.

27

28    COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 28

Dated this _____ day of September, 2016

BADGLEY MULLINS TURNER, PLLC


By s/Duncan C. Turner
Duncan C. Turner, WSBA No. 20597
19929 Ballinger Way NE, Suite 200
Seattle, Washington 98155
Telephone: 206-621-6566
Facsimile: 206-621-9686
Email: dturner@badgleymullins.com
**Attorneys for Plaintiff**

PROFY PROMISLOFF & CIARLANTO, P.C.

Jeffrey J. Ciarlanto
Joseph M. Profy
David M. Promisloff
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642

POMERANTZ LLP

Gustavo F. Bruckner
Gabriel Henriquez
600 Third Avenue, 20th Floor
New York, NY 10016
Phone: (212) 661-1100
Fax: (917) 463-1044

LAW OFFICE OF ALFRED G. YATES, JR., P.C.

Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033
**Attorneys for Plaintiff**

COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES AND UNJUST
ENRICHMENT - 29

# EXHIBIT A

# PROFY PROMISLOFF & CIARLANTO, P.C.

ATTORNEYS AT LAW
100 N. 22ⁿᵈ Street, Unit 105
PHILADELPHIA, PENNSYLVANIA 19103

———

TEL 215-259-5156
FAX 215-600-2642
*www.prolawpa.com*

December 2, 2015

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Howard Schultz
Chairman of the Board and Chief Executive Officer
Starbucks Corporation
2401 Utah Avenue South
Seattle, WA 98134

Re:    <u>Shareholder Demand Pursuant to Washington Law</u>

Dear Mr. Schultz:

These firms represent David V. Myers (the "Stockholder"), a current stockholder of Starbucks Corporation ("Starbucks" or the "Company"). Pursuant to Washington law, we write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy potential breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company, including (but not necessarily limited to) yourself ("Schultz"), William (Bill) Bradley ("Bradley"), Robert M. Gates ("Gates"), Mellody Hobson ("Hobson"), Kevin Johnson ("Johnson"), Olden Lee ("Lee") Joshua Cooper Ramo ("Ramo"), James Shennan, Jr. ("Shennan"), Clara Shih ("Shih"), Javier Teruel ("Teruel"), Myron Ullman, III ("Ullman"), Craig Weatherup ("Weatherup"), and Scott Maw ("Maw"). Collectively, the foregoing executive officers and/or directors of the Company will be referred to herein as "Management."

As you are aware, by reason of their positions as officers and/or directors of Starbucks and because of their ability to control the business and corporate affairs of Starbucks, Management owed and owes Starbucks and its shareholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use its utmost ability to control and manage Starbucks and its subsidiaries in a fair, just, and honest manner in compliance with all applicable foreign, federal, state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company and its subsidiaries conduct their business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws. The Stockholder believes that Management has violated these core

fiduciary duty principles, which culminated in the European Union (the "EU")[1] bringing charges against the Company for illegal receipt of tax advantages.

## I.  FACTUAL BACKGROUND

### A.  Overview of the Company and its Policies

Starbucks was founded in 1985 and is based in Seattle, Washington. According to its public filings, Starbucks operates as a roaster, marketer, and retailer of specialty coffee worldwide. The Company operates in four segments: Americas; Europe, Middle East, and Africa ("EMEA"); China/Asia Pacific; and Channel Development. The Company's stores offer coffee and tea beverages, packaged roasted whole bean and ground coffees, single serve products, and juices and bottled water. Its stores also provide fresh food offerings; ready-to-drink beverages; and various food products, such as pastries, and breakfast sandwiches and lunch items, as well as beverage-making equipment and accessories. In addition, the Company licenses the rights to produce and distribute Starbucks branded products to The North American Coffee Partnership with the Pepsi-Cola Company, as well as licenses its trademarks through licensed stores, and grocery and national foodservice accounts. The Company offers its products under the Starbucks, Teavana, Tazo, Seattle's Best Coffee, Evolution Fresh, La Boulange, Ethos, Starbucks VIA, Frappuccino, Starbucks Doubleshot, Starbucks Refreshers, and Starbucks Discoveries Iced Café Favorites brand names. As of September 22, 2015, the Company operated 22,000 stores.

The Company's presence in the European Union is included in the EMEA segment. In the Company's 2014 Annual Report on Form 10-K (the "2014 10-K") filed with the United States Securities and Exchange Commission (the "SEC") on November 14, 2014, Management broke down the Company's segments as follows:

> We have four reportable operating segments: 1) Americas, which is inclusive of the US, Canada, and Latin America; 2) Europe, Middle East, and Africa ("EMEA"); 3) China/Asia Pacific ("CAP") and 4) Channel Development. We also have several non-reportable operating segments, including Teavana, Seattle's Best Coffee, Evolution Fresh, and our Digital Ventures business, which are combined and referred to as All Other Segments. Revenues from our reportable segments and All Other Segments as a percentage of total net revenues for fiscal 2014 were as follows: Americas (73%), EMEA (8%), CAP (7%), Channel Development (9%) and All Other Segments (3%).

In light of the Company's European presence, in the 2014 10-K (and in prior and subsequent SEC filings), Management specifically recognized the importance of adhering to the various international regulations and policies that govern the Company. Specifically,

---

[1] For purposes of this Demand, the European Union and European Commission shall be used interchangeably, as will EU and EC, respectively.

Management stated:

> Failure to comply with applicable laws and regulations could harm our business and financial results. Our policies and procedures are designed to comply with all applicable laws, accounting and reporting requirements, tax rules and other regulations and requirements, including those imposed by the SEC, NASDAQ, and foreign countries, as well as applicable trade, labor, healthcare, privacy, food, anti-bribery and corruption and merchandise laws. The complexity of the regulatory environment in which we operate and the related cost of compliance are both increasing due to additional or changing legal and regulatory requirements, our ongoing expansion into new markets and new channels, and the fact that foreign laws occasionally conflict with domestic laws. In addition to potential damage to our reputation and brand, failure to comply with the various laws and regulations, as well as changes in laws and regulations or the manner in which they are interpreted or applied, may result in litigation, civil and criminal liability, damages, fines and penalties, increased cost of regulatory compliance and restatements of our financial statements.

Moreover, with respect to income taxes specifically, Management stated the following in the 2014 10-K:

> **Income Taxes.** We recognize deferred tax assets and liabilities based on the differences between the financial statement carrying amounts and the respective tax bases of our assets and liabilities. Deferred tax assets and liabilities are measured using current enacted tax rates expected to apply to taxable income in the years in which we expect the temporary differences to reverse. We routinely evaluate the likelihood of realizing the benefit of our deferred tax assets and may record a valuation allowance if, based on all available evidence, we determine that some portion of the tax benefit will not be realized. Changes in tax laws and rates may affect recorded deferred tax assets and liabilities and our effective tax rate in the future; however, we do not expect changes from recently enacted tax laws to be material to the consolidated financial statements.
>
> In evaluating our ability to recover our deferred tax assets within the jurisdiction from which they arise, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax-planning strategies, and results of recent operations. In projecting future taxable income, we consider historical results and incorporate assumptions about the amount of future state, federal, and foreign pretax operating income adjusted for items that do not have tax consequences. Our assumptions regarding future taxable income are consistent with the plans and estimates we are using to manage the underlying businesses. In evaluating the objective evidence that

historical results provide, we consider three years of cumulative operating income/(loss).

In addition, our income tax returns are periodically audited by domestic and foreign tax authorities. These audits include review of our tax filing positions, including the timing and amount of deductions taken and the allocation of income between tax jurisdictions. We evaluate our exposures associated with our various tax filing positions and recognize a tax benefit only if it is more likely than not that the tax position will be sustained upon examination by the relevant taxing authorities, including resolutions of any related appeals or litigation processes, based on the technical merits of our position. For uncertain tax positions that do not meet this threshold, we record a related liability. We adjust our unrecognized tax benefit liability and income tax expense in the period in which the uncertain tax position is effectively settled, the statute of limitations expires for the relevant taxing authority to examine the tax position, or when new information becomes available. There is a reasonable possibility that our unrecognized tax benefit liability will be adjusted within 12 months due to the expiration of a statute of limitations; however, we do not expect this change to be material to the consolidated financial statements.

We have generated income in certain foreign jurisdictions that has not been subject to US income taxes. We intend to reinvest these earnings for the foreseeable future. While we do not expect to repatriate cash to the US to satisfy domestic liquidity needs, if these amounts were distributed to the US, in the form of dividends or otherwise, we would be subject to additional US income taxes, which could be material. Determination of the amount of unrecognized deferred income tax liabilities on these earnings is not practicable because such liability, if any, is dependent on circumstances existing if and when remittance occurs.

Our income tax expense, deferred tax assets and liabilities, and liabilities for unrecognized tax benefits reflect management's best assessment of estimated current and future taxes to be paid. Deferred tax asset valuation allowances and our liabilities for unrecognized tax benefits require significant management judgment regarding applicable statutes and their related interpretation, the status of various income tax audits, and our particular facts and circumstances. Although we believe that the judgments and estimates discussed herein are reasonable, actual results could differ, and we may be exposed to losses or gains that could be material. To the extent we prevail in matters for which a liability has been established, or are required to pay amounts in excess of our established liability, our effective income tax rate in a given financial statement period could be materially affected.

4

Recognizing the importance of following the laws of the various countries in which the Company conducts its business, the Board, in general, and the Board's Audit and Compliance Committee (the "Audit Committee"), in particular, have specifically adopted numerous internal policies and procedures to ensure that the Company is purportedly run lawfully worldwide. For instance, pursuant to the Audit Committee's Charter, in addition to being responsible for overseeing the disclosure of the Company's financial statements and overseeing its internal controls, its members are specifically responsible for overseeing the Company's "major risk exposures, including financial, operational, privacy, security, business continuity and legal and regulatory risks, the steps the Company has taken to monitor and control such exposures, and the Company's risk assessment and risk management policies; and regularly report to the Board the substance of such reviews and discussions."[2]

In addition, certain members of Management – including (but not necessarily limited to) Schultz, Johnson, and Maw – were required to comply with the Company's "Code of Ethics for CEO, COO, CFO and Finance Leaders." This Code of Ethics sets forth:

> In my financial leadership role with Starbucks Coffee Company, I recognize that I hold an important and elevated role in corporate governance. I am charged with ensuring that stakeholders' interests are appropriately balanced, protected and preserved. Accordingly, this Code provides principles to which I am expected to adhere.
>
> To the best of my knowledge and ability, in executing my job responsibilities:
>
> 1. I act with honesty and integrity, avoiding actual or apparent conflicts of interest.
>
> 2. I provide internal and external constituents with appropriate and objective information that is full, fair, accurate, timely and understandable.
>
> 3. I comply with all applicable governmental laws, rules and regulations, and other appropriate private and public regulatory agencies' requirements. I ensure the Company's corporate books and records are maintained with accuracy and integrity.
>
> 4. I act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing my independent

---

[2] Presently, Hobson, Gates, Ramo, Teruel and Weatherup serve as members of the Audit Committee.

judgment to be compromised.

5. I respect the confidentiality of information acquired in the course of my work except when authorized or otherwise legally obligated to disclose. I will not use confidential information acquired in the course of my work for personal advantage.

6. I proactively promote ethical behavior as a responsible partner among others in my work environment. I understand my accountability for adhering to this code and my responsibility to report violations of this code, including concerns regarding accounting and internal controls matters, to the corporate compliance officer or other appropriate individuals in accordance with Starbucks Standards of Business Conduct.

7. I exercise responsible stewardship over company assets and resources.

Accordingly, under no set of circumstances can Management claim that it was unaware of the importance of the European market or that it was unaware of the consequences that failing to comply with all EU laws (including tax laws) would undoubtedly bring on the Company.

B.  **Management Causes the Company's SEC Filings to be False and Misleading**

Due to Management's illegal tax avoidance scheme, the Forms 10-K filed with the SEC over the past several years have been false and misleading, including the 2014 10-K. By way of example, the 2014 10-K contained the following information regarding the Company's earnings and tax payments in fiscal years 2014, 2013 and 2012:

STARBUCKS CORPORATION
CONSOLIDATED STATEMENTS OF EARNINGS
*(in millions, except per share data)*

| Fiscal Year Ended | Sep 28, 2014 | | Sep 29, 2013 | | Sep 30, 2012 | |
|---|---|---|---|---|---|---|
| Net revenues: | | | | | | |
| Company-operated stores | $ | 12,977.9 | $ | 11,793.2 | $ | 10,534.5 |
| Licensed stores | | 1,588.6 | | 1,360.5 | | 1,210.3 |
| CPG, foodservice and other | | 1,881.3 | | 1,713.1 | | 1,532.0 |
| Total net revenues | | 16,447.8 | | 14,866.8 | | 13,276.8 |
| Cost of sales including occupancy costs | | 6,858.8 | | 6,382.3 | | 5,813.3 |
| Store operating expenses | | 4,638.2 | | 4,286.1 | | 3,918.1 |
| Other operating expenses | | 457.3 | | 431.8 | | 407.2 |
| Depreciation and amortization expenses | | 709.6 | | 621.4 | | 550.3 |
| General and administrative expenses | | 991.3 | | 937.9 | | 801.2 |
| Litigation charge/(credit) | | (20.2) | | 2,784.1 | | |
| Total operating expenses | | 13,635.0 | | 15,443.6 | | 11,490.1 |
| Income from equity investees | | 268.3 | | 251.4 | | 210.7 |
| Operating income/(loss) | | 3,081.1 | | (325.4) | | 1,997.4 |
| Interest income and other, net | | 142.7 | | 123.6 | | 94.4 |
| Interest expense | | (64.1) | | (28.1) | | (32.7) |
| Earnings/(loss) before income taxes | | 3,159.7 | | (229.9) | | 2,059.1 |
| Income tax expense/(benefit) | | 1,092.0 | | (238.7) | | 674.4 |
| Net earnings including noncontrolling interests | | 2,067.7 | | 8.8 | | 1,384.7 |
| Net earnings/(loss) attributable to noncontrolling interests | | (0.4) | | 0.5 | | 0.9 |
| Net earnings attributable to Starbucks | $ | 2,068.1 | $ | 8.3 | $ | 1,383.8 |
| Earnings per share — basic | $ | 2.75 | $ | 0.01 | $ | 1.83 |
| Earnings per share — diluted | $ | 2.71 | $ | 0.01 | $ | 1.79 |
| Weighted average shares outstanding: | | | | | | |
| Basic | | 753.1 | | 749.3 | | 754.4 |
| Diluted | | 763.1 | | 762.3 | | 773.0 |

\*        \*        \*

### Note 13: Income Taxes

Components of earnings/(loss) before income taxes *(in millions):*

| Fiscal Year Ended | Sep 28, 2014 | Sep 29, 2013 | | | Sep 30, 2012 |
|---|---|---|---|---|---|
| | | Total | Litigation charge | All Other | |
| United States | $ 2,572.4 | $ (674.0) $ | (2,784.1) $ | 2,110.1 | $ 1,679.6 |
| Foreign | 587.3 | 444.1 | — | 444.1 | 379.5 |
| Total earnings/(loss) before income taxes | $ 3,159.7 | $ (229.9) $ | (2,784.1) $ | 2,554.2 | $ 2,059.1 |

Provision/(benefit) for income taxes *(in millions):*

| Fiscal Year Ended | Sep 28, 2014 | Sep 29, 2013 | | | Sep 30, 2012 |
|---|---|---|---|---|---|
| | | Total | Litigation charge | All Other | |
| Current taxes: | | | | | |
| US federal | $ 822.7 | $ 616.6 $ | — $ | 616.6 | $ 466.0 |
| US state and local | 132.9 | 93.8 | — | 93.8 | 79.9 |
| Foreign | 128.8 | 95.9 | — | 95.9 | 76.8 |
| Total current taxes | 1,084.4 | 806.3 | — | 806.3 | 622.7 |
| Deferred taxes: | | | | | |
| US federal | 12.0 | (898.8) | (922.1) | 23.3 | 49.2 |
| US state and local | (4.9) | (144.0) | (148.7) | 4.7 | (0.7) |
| Foreign | 0.5 | (2.2) | — | (2.2) | 3.2 |
| Total deferred taxes | 7.6 | (1,045.0) | (1,071.0) | 26.0 | 51.7 |
| Total income tax expense/(benefit) | $ 1,092.0 | $ (238.7) $ | (1,071.0) $ | 832.3 | $ 674.4 |

In addition, the 2014 10-K contained certifications pursuant to the Sarbanes-Oxley

Act of 2002 ("SOX Certifications"), signed by Schultz and Maw. The SOX Certifications, which attested to the adequacy of the Company's internal controls, set forth:

I, [Howard Schultz/Scott Maw], certify that:

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended September 28, 2014 of Starbucks Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal

8

control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*       \*       \*

In connection with the Annual Report of Starbucks Corporation ("Starbucks") on Form 10-K for the fiscal year ended September 28, 2014, as filed with the Securities and Exchange Commission on November 14, 2014 (the "Report"), Howard Schultz, chairman, president and chief executive officer, and Scott Maw, executive vice president, chief financial officer of Starbucks, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Starbucks.

C.     **Beginning in 2014, Company Comes Under Fire For Tax Violations in the EU**

In June 2014, the EU began investigating the Company's tax practices. A press release[3] by the European Commission dated June 11, 2014 set forth, in relevant part:

---

[3] *See*: http://europa.eu/rapid/press-release_IP-14-663_en.htm.

**State aid: Commission investigates transfer pricing arrangements on corporate taxation of Apple (Ireland) Starbucks (Netherlands) and Fiat Finance and Trade (Luxembourg)**

The European Commission has opened three in-depth investigations to examine whether decisions by tax authorities in Ireland, The Netherlands and Luxembourg with regard to the corporate income tax to be paid by Apple, Starbucks and Fiat Finance and Trade, respectively, comply with the EU rules on state aid. The opening of an in-depth investigation gives interested third parties, as well as the three Member States concerned, an opportunity to submit comments. It does not prejudge the outcome of the investigation.

Commission Vice President in charge of competition policy Joaquín Almunia said: "In the current context of tight public budgets, it is particularly important that large multinationals pay their fair share of taxes. Under the EU's state aid rules, national authorities cannot take measures allowing certain companies to pay less tax than they should if the tax rules of the Member State were applied in a fair and non-discriminatory way."

Algirdas Šemeta, Commissioner for Taxation, said: "Fair tax competition is essential for the integrity of the Single Market, for the fiscal sustainability of our Member States, and for a level-playing field between our businesses. Our social and economic model relies on it, so we must do all we can to defend it."

The Commission has been investigating under EU state aid rules certain tax practices in several Member States following media reports alleging that some companies have received significant tax reductions by way of "tax rulings" issued by national tax authorities. Tax rulings as such are not problematic: they are comfort letters by tax authorities giving a specific company clarity on how its corporate tax will be calculated or on the use of special tax provisions. However, tax rulings may involve state aid within the meaning of EU rules if they are used to provide selective advantages to a specific company or group of companies.

According to Article 107(1) of the Treaty on the Functioning of the European Union (TFEU), state aid which affects trade between Member States and threatens to distort competition by favouring certain undertakings is in principle incompatible with the EU Single Market. Selective tax advantages may amount to state aid. The Commission does not call into question the general tax regimes of the three Member States concerned.

Tax rulings are used in particular to confirm transfer pricing arrangements. Transfer pricing refers to the prices charged for commercial transactions between various parts of the same group of companies, in particular prices set for goods sold or services provided by one subsidiary of a corporate group to another subsidiary of the same group. Transfer pricing influences the allocation of taxable profit between subsidiaries of a group located in different countries.

If tax authorities, when accepting the calculation of the taxable basis proposed by a company, insist on a remuneration of a subsidiary or a branch on market terms, reflecting normal conditions of competition, this would exclude the presence of state aid. However, if the calculation is not based on remuneration on market terms, it could imply a more favourable treatment of the company compared to the treatment other taxpayers would normally receive under the Member States' tax rules. This may constitute state aid.

The Commission will examine if the three transfer pricing arrangements validated in the following tax rulings involve state aid to the benefit of the beneficiary companies:

*       *       *

• the individual ruling issued by the Dutch tax authorities on the calculation of the taxable basis in the Netherlands for manufacturing activities of Starbucks Manufacturing EMEA BV;

*       *       *

The Commission has reviewed the calculations used to set the taxable basis in those rulings and, based on a preliminary analysis, has concerns that they could underestimate the taxable profit and thereby grant an advantage to the respective companies by allowing them to pay less tax. The Commission notes that the three rulings concern only arrangements about the taxable basis; they do not relate to the applicable tax rate itself.

In parallel to these three formal investigations, the Commission will continue its wider inquiry into tax rulings, which covers more Member States.

Luxembourg, contrary to The Netherlands and Ireland, only provided the Commission with a limited sample of the information requested (see IP/14/309), which included the ruling for Fiat Finance and Trade, but not the complete information demanded by the Commission. The

11

Commission has therefore initiated infringement proceedings against Luxembourg by issuing letters of formal notice.

**Background**

The Commission is looking at the compliance with EU state aid rules of certain tax practices in some Member States in the context of aggressive tax planning by multinationals, with a view to ensure a level playing field. A number of multinational companies are using tax planning strategies to reduce their global tax burden, by taking advantage of the technicalities of tax systems, and substantially reducing their tax liabilities. This aggressive tax planning practice erodes the tax bases of Member States, which are already financially constrained.

Regarding tax rulings specifically, the preliminary enquiries have shown that the quality and the consistency of the scrutiny by the tax authorities differ substantively across Member States. In particular, the Commission notes that The Netherlands seem to generally proceed with a thorough assessment based on comprehensive information required from the tax payer. The Commission therefore does not expect to encounter systematic irregularities in tax rulings. However, at this stage the Commission has concerns that the tax ruling for Starbucks Manufacturing EMEA BV is providing that company with a selective advantage, because there are doubts whether it is in line with a market-based assessment of transfer pricing.

Notably, in the Company's SEC filings, Management failed to disclose the severity of the EU's investigation and the potential negative effects it could (and would) ultimately have on the Company. For example, in the 2014 10-K, Management did not even disclose the existence of the investigation.

### D.     Formal Charges Are Brought Against the Company by the European Commission

Notwithstanding Management's seeming lack of attention to the issue, on October 21, 2015 the EC formally filed charges against Starbucks for tax violations (the "EU Action"). The EC found that Starbucks (under Management's direction and on its watch) had utilized illegal selective tax advantages which employed artificial and complex methods. A press release[4] issued that day set forth, in relevant part:

**The European Commission has decided that Luxembourg and the Netherlands have granted selective tax advantages to Fiat Finance and**

---

[4] *See*: http://europa.eu/rapid/press-release_IP-15-5880_en.htm.

**Trade and Starbucks, respectively. These are illegal under EU state aid rules.**

Commissioner Margrethe Vestager, in charge of competition policy, stated: "Tax rulings that artificially reduce a company's tax burden are not in line with EU state aid rules. They are illegal. I hope that, with today's decisions, this message will be heard by Member State governments and companies alike. All companies, big or small, multinational or not, should pay their fair share of tax."

Following in-depth investigations, which were launched in June 2014, the Commission has concluded that Luxembourg has granted selective tax advantages to Fiat's financing company and the Netherlands to Starbucks' coffee roasting company. In each case, a tax ruling issued by the respective national tax authority artificially lowered the tax paid by the company.

Tax rulings as such are perfectly legal. They are comfort letters issued by tax authorities to give a company clarity on how its corporate tax will be calculated or on the use of special tax provisions. However, the two tax rulings under investigation endorsed artificial and complex methods to establish taxable profits for the companies. They do not reflect economic reality. This is done, in particular, by setting prices for goods and services sold between companies of the Fiat and Starbucks groups (so-called "transfer prices") that do not correspond to market conditions. As a result, most of the profits of Starbucks' coffee roasting company are shifted abroad, where they are also not taxed, and Fiat's financing company only paid taxes on underestimated profits.

This is illegal under EU state aid rules: Tax rulings cannot use methodologies, no matter how complex, to establish transfer prices with no economic justification and which unduly shift profits to reduce the taxes paid by the company. It would give that company an unfair competitive advantage over other companies (typically SMEs) that are taxed on their actual profits because they pay market prices for the goods and services they use.

Therefore, the Commission has ordered Luxembourg and the Netherlands to recover the unpaid tax from Fiat and Starbucks, respectively, in order to remove the unfair competitive advantage they have enjoyed and to restore equal treatment with other companies in similar situations. The amounts to recover are €20 - €30 million for each company. It also means that the companies can no longer continue to benefit from the advantageous tax treatment granted by these tax rulings.

Furthermore, the Commission continues to pursue its inquiry into tax rulings practices in all EU Member States. It cannot prejudge the opening of additional formal investigations into tax rulings if it has indications that EU state aid rules are not being complied with. Its existing formal investigations into tax rulings in Belgium, Ireland and Luxembourg are ongoing. Each of the cases is assessed on its merits and today's decisions do not prejudge the outcome of the Commission's ongoing probes.

*      *      *

## Starbucks

Starbucks Manufacturing EMEA BV ("Starbucks Manufacturing"), based in the Netherlands, is the only coffee roasting company in the Starbucks group in Europe. It sells and distributes roasted coffee and coffee-related products (e.g. cups, packaged food, pastries) to Starbucks outlets in Europe, the Middle East and Africa.

The Commission's investigation showed that a tax ruling issued by the Dutch authorities in 2008 gave a selective advantage to Starbucks Manufacturing, which has unduly reduced Starbucks Manufacturing's tax burden since 2008 by €20 - €30 million. In particular, the ruling artificially lowered taxes paid by Starbucks Manufacturing in two ways:

- Starbucks Manufacturing pays a very substantial royalty to Alki (a UK-based company in the Starbucks group) for coffee-roasting know-how.

- It also pays an inflated price for green coffee beans to Switzerland-based Starbucks Coffee Trading SARL.

The Commission's investigation established that the royalty paid by Starbucks Manufacturing to Alki cannot be justified as it does not adequately reflect market value. In fact, only Starbucks Manufacturing is required to pay for using this know-how – no other Starbucks group company nor independent roasters to which roasting is outsourced are required to pay a royalty for using the same know-how in essentially the same situation. In the case of Starbucks Manufacturing, however, the existence and level of the royalty means that a large part of its taxable profits are unduly shifted to Alki, which is neither liable to pay corporate tax in the UK, nor in the Netherlands.

Furthermore, the investigation revealed that Starbucks Manufacturing's tax base is also unduly reduced by the highly inflated price it pays for green coffee beans to a Swiss company, Starbucks Coffee Trading SARL. In fact, the margin on the beans has more than tripled since 2011. Due to this high

14

key cost factor in coffee roasting, Starbucks Manufacturing's coffee roasting activities alone would not actually generate sufficient profits to pay the royalty for coffee-roasting know-how to Alki. The royalty therefore mainly shifts to Alki profits generated from sales of other products sold to the Starbucks outlets, such as tea, pastries and cups, which represent most of the turnover of Starbucks Manufacturing.



### Recovery

As a matter of principle, EU state aid rules require that incompatible state aid is recovered in order to reduce the distortion of competition created by the aid. In its two decisions the Commission has set out the methodology to calculate the value of the undue competitive advantage enjoyed by Fiat and Starbucks, i.e. the difference between what the company paid and what it would have paid without the tax ruling. This amount is €20 - €30 million for each of Fiat and Starbucks but the precise amounts of tax to be recovered must now be determined by the Luxembourg and Dutch tax authorities on the basis of the methodology established in the Commission decisions.

### New investigative tools

In the two investigations the Commission has for the first time used information request tools under a Council decision by Member States of July 2013 (Regulation 734/2013). Using these powers the Commission can,

if the information provided by the Member State subject to the state aid investigation is not sufficient, ask that any other Member State as well as companies (including the company benefitting from the aid measure or its competitors) provide directly to the Commission all market information necessary to enable it to complete its state aid assessment. These new tools form part of the State Aid Modernisation initiative launched by the Commission in 2012 to allow it to concentrate its enforcement efforts on aid that is most liable to distort competition.

On November 12, 2015, Management caused the Company to file with the SEC its Form 10-K for fiscal year 2015 (the "2015 10-K"). Therein, Management finally disclosed the Company's non-compliance with EU tax policies, the existence of the EU Action, and the potential adverse effects it could have on the Company's financial statements, including the potentially $32 million due in past taxes. Specifically, the 2015 10-K stated, in pertinent part:

> Subsequent to our fiscal year end, the European Commission has concluded that decisions by the tax authorities in the Netherlands with regards to the corporate income tax paid by one of our subsidiaries did not comply with European Union rules on state aid. Based on this decision, which covers a 7-year period from fiscal 2008 to fiscal 2014, we estimate the amount of assessed past taxes to be no more than €30 million, including interest, which equates to approximately $32 million with euro converted into U.S. dollars at a reference conversion rate of 1.075 EUR to USD. The exposure amount is not material and we are currently evaluating this decision, including any impact to our fiscal 2016 tax provisions.

## II.    DEMAND PURSUANT TO WASHINGTON LAW

Based on these events, the Stockholder contends that Management: 1. breached its fiduciary duties of loyalty and good faith in connection with the management, operation and oversight of the Company's business; 2. breached its fiduciary duty of good faith to establish and maintain adequate internal controls; 3. breached its fiduciary duties by disseminating false, misleading and/or incomplete information; and 4. breached its fiduciary duties by employing illegal and artificial methods in order to avoid payment of taxes in the EU. As a result of the foregoing breaches of duty, Starbucks has sustained damages including, but not limited to, being subjected to the EU Action, facing payment of back taxes in an amount up to approximately $32 million, and damage to the Company's goodwill and reputation.

Accordingly, pursuant to Washington Law, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Washington law, federal law, and the laws of the EU; and (ii) if warranted, commence a civil action against each member of

16

Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

Pursuant to Washington law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

PROFY PROMISLOFF
& CIARLANTO, P.C.

Jeffrey J. Ciarlanto

LAW OFFICE OF ALFRED G. YATES, JR., P.C.

Alfred G. Yates, Jr. w/permission

cc: David V. Myers

17

# EXHIBIT B



**Gustavo F. Bruckner**
Partner

January 27, 2016

<u>*VIA FEDERAL EXPRESS*</u>

The Board of Directors
Starbucks Corporation
2401 Utah Avenue South
Seattle, Washington 98134

RE:   <u>**Demand for Legal Action**</u>

To the Members of Starbucks Corporation Board of Directors:

This letter is written on behalf of Shiva Y. Stein ("Ms. Stein"), the current owner of the common stock of Starbucks Corporation ("Starbucks" or the "Company"), a Washington corporation. Attached to this letter as Exhibit "A" is evidence of Ms. Stein's ownership of shares of Starbucks common stock. Attached to this letter as Exhibit "B" is a true and correct copy of the Special Power of Attorney authorizing Pomerantz LLP to act on behalf of Ms. Stein in connection with this demand. Pursuant to Washington CR 23.1 and all other applicable law, Ms. Stein hereby demands that the Company take immediate legal and other remedial action to redress the damage to the Company and its shareholders resulting from the breaches of fiduciary duty committed by certain officers, directors and employees of the Company, as outlined herein.

Ms. Stein demands that legal action be taken to recover losses sustained by the Company resulting from the potential violations of tax law and successive negative publicity and damage to the Company and its reputation that have plagued the Company under the watch its Board of Directors (the "Board") for years, all of which could have been avoided, or at the very least minimized, had the Board exercised proper supervision and oversight.

As described in Ms. Stein's books and records demand letter dated August 13, 2015 (the "Demand"), there is ample evidence of the damages to the Company caused by the Board's unreasonably risks tax policies. Indeed, on April 7, 2015, the *Wall Street Journal* reported that Starbucks' tax practices have come under scrutiny in Europe after investigations showed that Starbucks had been reporting losses in its biggest European markets for years despite recording

gfbruckner@pomlaw.com

600 Third Avenue, New York, New York 10016  tel: 212.661.1100  www.pomerantzlaw.com

NEW YORK     CHICAGO     LOS ANGELES     WESTON, FL

hundreds of millions of dollars of annual sales.[1]

On November 14, 2014, the *Guardian* reported that since Starbucks' UK subsidiary opened in 1998, it had only paid £8.3 million in corporate taxes, despite racking up sales of more than £3 billion.[2] An investigation by *Reuters* showed the Company used strategies to reduce its tax liability including, but not limited to: (i) making payments to other companies in the Starbucks group for its coffee supplies, use of the Starbucks logo, shop format, and coffee beans; and (ii) imposing interest on loans within the Starbucks group.[3] At parliamentary hearings on tax avoidance held in the UK in 2012, executives of Starbucks maintained that their tax policies were legal. However, shortly thereafter, on December 2, 2012, Starbucks publicly pledged to review its UK tax practices:

> We have listened to feedback from our customers and employees, and understand that to maintain and further build public trust we need to do more. As part of this we are looking at our tax approach in the UK. The company has been in discussions with HMRC for some time and is also in talks with the Treasury.[4]

In an unprecedented announcement made at the London Chamber of Commerce on December 6, 2012, Starbucks UK Managing Director Kris Engskov said that the Company would pay £10 million of U.K. corporation tax in 2013 and 2014 regardless of whether the Company is profitable:[5]

> In 2013 and 2014 Starbucks will not claim the tax deductions for royalties or payments related to our intercompany charges for interest and mark-up on the coffee we buy. Such a move is unprecedented so

---

[1] Huge Profit Stokes Concerns Over Starbucks' Tax Practices in Europe- http://www.wsj.com/articles/starbuckss-tax-practices-draw-european-scrutiny-1428363189 (last accessed on 8/13/2015)

[2] EC says Starbucks' Dutch tax Deal at Odds with Competition Law- http://www.theguardian.com/business/2014/nov/14/starbucks-dutch-tax-deal-european-commission (last accessed on 8/13/2015)

[3] Special Report: How Starbucks avoids UK Taxes- http://www.reuters.com/article/2012/10/15/us-britain-starbucks-tax-idUSBRE89E0EX20121015 (last accessed on 8/13/2015)

[4] Starbucks to Review U.K. Tax Payments http://www.wsj.com/articles/SB10001424127887323401904578155101706655328 (last accessed on 8/13/2015).

[5] http://www.starbucks.co.uk/our-commitment (last accessed on 8/13/2015)

**POMERANTZ**LLP

we will have to work out the details of an approach that will enable us to make a change and to ultimately contribute more.

In addition, we have committed to paying a significant amount of corporation tax during 2013 and 2014 regardless of whether our company is profitable during these years. We are still working through some of the calculations, but we believe we could pay or prepay somewhere in the range of £10 million in each of the next two years in addition to the variety of taxes we already pay.[6]

On April 7, 2015, the *Wall Street Journal* reported that in 2013, Starbucks' tax practices in the Netherlands came under scrutiny after accounts filed by Starbucks' Amsterdam subsidiary showed that it had paid only €2.6 million in corporate tax on €407 million pretax profit – or well under 1% -- as part of a deal with the Dutch government.[7] Starbucks' then-chief financial officer, Troy Alstead ("Alstead"), explained that Starbucks had secured a tax deal with the Netherlands that allowed it to pay tax at a "very low rate."[8] As European regulators opened a formal investigation into Starbucks' tax practices in the Netherlands, a profit suddenly materialized: €407 million were reported by the Company's then head office in Amsterdam.[9] On October 21, 2015, the European Commission found that the tax agreement struck between the Netherlands and the Company was illegal. The European Commission further ordered the Netherlands to recover the unpaid tax from Starbucks, which it estimated at between €20 million and €30 million since 2009.

Shortly after the European Commission made public a report[10] on November 6, 2014 accusing Starbucks and the Netherlands of making an unfair tax deal, Alstead – who had since been promoted on January 29, 2014 to a newly-created

---

[6] *Id.*

[7] Huge Profit Stokes Concerns Over Starbucks' Tax Practices in Europe- http://www.wsj.com/articles/starbuckss-tax-practices-draw-european-scrutiny-1428363189 (last accessed on 8/13/2015)

[8] EC says Starbucks' Dutch tax Deal at Odds with Competition Law
http://www.theguardian.com/business/2014/nov/14/starbucks-dutch-tax-deal-european-commission (last accessed on 8/13/2015)

[9] Huge Profit Stokes Concerns Over Starbucks' Tax Practices in Europe- http://www.wsj.com/articles/starbuckss-tax-practices-draw-european-scrutiny-1428363189 (last accessed on 8/13/2015)

[10] http://ec.europa.eu/competition/state_aid/cases/253201/253201_1596706_60_2.pdf (last accessed on 8/13/2015).