**THE HONORABLE RICHARD A. JONES**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVID V. MYERS and SHIVA Y. STEIN, derivatively on behalf of STARBUCKS CORPORATION,

　　　　　　　　　　Plaintiffs,

　　v.

TROY ALSTEAD, MARY N. DILLON, ROBERT M. GATES, MELLODY HOBSON, KEVIN R. JOHNSON, SCOTT MAW, JOSHUA COOPER RAMO, HOWARD SCHULTZ, JAMES G. SHENNAN, JR., CLARA SHIH, JAVIER G. TERUEL, MYRON E. ULLMAN, III, CRAIG E. WEATHERUP,

　　　　　　　　　　Defendants,

and

STARBUCKS CORPORATION,

　　　　　　　　　　Nominal Defendant.

CASE NO.: CV16-1580-RAJ

**NOMINAL DEFENDANT STARBUCKS CORPORATION'S MOTION TO DISMISS COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT**

NOTE ON MOTION CALENDAR: April 28, 2017

ORAL ARGUMENT REQUESTED

**WILSON SONSINI GOODRICH & ROSATI, PC**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND................................................................ 1

ARGUMENT ....................................................................................................................... 7

I.     THE COMPLAINT MUST BE DISMISSED PURSUANT TO FRCP 23.1
BECAUSE PLAINTIFFS WERE NOT STARBUCKS SHAREHOLDERS AT
THE TIME OF THE ALLEGED WRONGDOING.................................................... 8

II.    THE DECISION TO FILE A LAWSUIT ON BEHALF OF THE COMPANY
BELONGS TO THE BOARD OF DIRECTORS, NOT PLAINTIFFS ..................... 13

III.   THE BUSINESS JUDGMENT RULE PROTECTS THE BOARD'S DECISION
NOT TO PURSUE THE CLAIMS ASSERTED IN THIS LITIGATION ..................... 14

IV.   PLAINTIFFS' ALLEGATIONS FAIL TO OVERCOME THE PRESUMPTION
OF GOOD FAITH UNDER THE BUSINESS JUDGMENT RULE.............................. 16

      A.     Plaintiffs' Allegations Do Not Come Close to Showing the
Overwhelmingly Obvious Merits of Their Claims, As Required ........................ 16

      B.     Plaintiffs' Allegations Do Not Create a Reasonable Doubt As to the
Sufficiency of the Board's Investigation of Plaintiffs' Demands ........................ 18

      C.     Plaintiffs' Allegations Do Not Show That the Board's Refusal of the
Demands Was Inexplicable, Grossly Negligent, Lacking a Rational
Purpose or Otherwise in Bad Faith ................................................................... 22

**WILSON SONSINI GOODRICH & ROSATI, PC**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

**CASES**

*Aronson v. Lewis,*
  473 A.2d 805 (Del. 1984) ...................................................................................... 15

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ..................................... 8

*Auerbach v. Bennett,*
  47 N.Y. 2d 619 (1979) ........................................................................................... 19

*Baron v. Siff,*
  1997 Del. Ch. LEXIS 152 (Del. Ch. Oct. 17, 1997) .................................. 16, 18, 20

*Barovic v. Ballmer,*
  72 F. Supp. 3d 1210 (W.D. Wash. 2014) ............................................................... 19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955 (2007) ..................................................................... 8

*Belova v. Sharp,*
  2008 U.S. Dist. LEXIS 19880 (D. Or. Mar. 13, 2008) ....................................... 7, 12

*Boeing Co. v. Shrontz,*
  1994 Del. Ch. LEXIS 14 (Del. Ch. Jan. 19, 1994) ................................................ 22

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 1998) ...................................................................................... 15

*Chirlin v. Crosby,*
  1982 Del. Ch. LEXIS 492 (Del. Ch. Dec. 7, 1982) .......................................... 12, 13

*Davis v. Cox,*
  180 Wn. App. 514, 325 P.3d 255 (2014) ............................................................... 14

*E*Trade Fin. Corp. v. Deutsche Bank AG,*
  631 F. Supp. 2d 313 (S.D.N.Y. 2009) .................................................................... 16

*E*Trade Fin. Corp. v. Deutsche Bank AG,*
  374 F. App'x 119 (2d Cir. 2010) ............................................................................. 16

*Espinoza ex rel. JPMorgan Chase & Co. v. Dimon,*
  807 F.3d 502 (2d Cir. 2015) ............................................................................*passim*

*Freedman v. Adams,*
  2012 Del. Ch. LEXIS 74 (Del. Ch. Mar. 30, 2012) ............................................... 17

*Freedman v. Adams,*
  58 A.3d 414 (Del. 2013) ........................................................................................ 17

**WILSON SONSINI GOODRICH & ROSATI, PC**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

*Friedman v. Maffei,*
    2016 Del. Ch. LEXIS 63 (Del. Ch. Apr. 13, 2016) ..................................................16, 22

*Furman v. Walton,*
    2007 U.S. Dist. LEXIS 39618 (N.D. Cal. 2007) ..........................................................22, 24

*Gatz v. Ponsoldt,*
    2004 Del. Ch. LEXIS 203 (Del. Ch. Nov. 5, 2004) ..........................................................22

*Goodwin v. Castleton,*
    19 Wn.2d 748, 144 P.2d 725 (1944) ..............................................13, 14, 15, 24

*Grafman v. Century Broad., Inc.,*
    762 F. Supp. 215 (N.D. Ill. 1991) ..........................................................................21

*Greenspun v. Del E. Webb Corp.,*
    634 F.2d 1204 (9th Cir. 1980) ........................................................................8

*Haberman v. Wash. Pub. Power Supply Sys.,*
    109 Wn.2d 107, 744 P.2d 1032 (1987) ..........................................................14

*Halpert Enters. v. Harrison,*
    2008 U.S. App. LEXIS 22557 (2d Cir. Oct. 15, 2008)............................................18

*Hawkins v. MedApproach Holdings, Inc.,*
    2014 U.S. Dist. LEXIS 111428 (S.D.N.Y. Aug. 11, 2014) ......................................16

*In re Accuray, Inc. S'holder Deriv. Litig.,*
    757 F. Supp. 2d 919 (N.D. Cal. 2010) ..........................................................9, 12

*In re Bank of N.Y. Deriv. Litig.,*
    173 F. Supp. 2d 193 (S.D.N.Y. 2001) ........................................................12, 13

*In re Bank of N.Y. Deriv. Litig.,*
    320 F.3d 291 (2d Cir. 2003) ..............................................................11, 12, 13

*In re Citigroup Inc. S'holder Deriv. Litig.,*
    964 A.2d 106 (Del. Ch. 2009) ......................................................................15

*In re Computer Scis. Corp. Deriv. Litig.,*
    2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 26, 2007) ........................................12

*In re Cray Inc. Deriv. Litig.,*
    431 F. Supp. 2d 1114 (W.D. Wash. 2006) ....................................................13, 18

*In re F5 Networks, Inc.,*
    166 Wn.2d 229, 207 P.3d 433 (2009) ..........................................................8, 14

*In re Facebook, Inc., IPO Deriv. Litig.,*
    797 F.3d 148 (2d Cir. 2015)............................................................8, 9, 11, 13

*In re infoUSA, Inc. S'holders Litig.,*
    953 A.2d 963 (Del. Ch. 2007) ......................................................................15

**WILSON SONSINI GOODRICH & ROSATI, PC**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

*In re Merrill Lynch & Co. Sec., Deriv. & ERISA Litig,*
  773 F. Supp. 2d 330 (S.D.N.Y. 2011) ...............................................*passim*

*In re Open Joint Stock Co. "Vimpel-Commc'ns" Sec. Litig.,*
  2006 U.S. Dist. LEXIS 10256 (S.D.N.Y. Mar. 14, 2006) ...............................18

*In re Silicon Graphics Inc. Sec. Litig.,*
  183 F.3d 970 (9th Cir. 1999) ........................................................8

*In re Spokane Concrete Prods., Inc.,*
  126 Wn.2d 269, 892 P.2d 98 (1995) .................................................14

*In re Spokane Concrete Prods., Inc.,*
  183 Wn.2d 269, 351 P.3d 862 (2015) ...............................................14

*Knopf v. Semel,*
  2010 WL 965308 (N.D. Cal. Mar. 17, 2010) ........................15, 16, 20, 22

*Levine v. Smith,*
  591 A.2d 194 (Del. 1991) ..........................................................*passim*

*Laborers v. Bailey,*
  310 F. App'x 128 (9th Cir. 2009) ..................................................12

*Lambrecht v. O'Neal,*
  504 F. App'x 427 (2d Cir. 2012) ...................................................15

*Lewis v. Chiles,*
  719 F.2d 1044 (9th Cir. 1983) ......................................................8

*Nursing Home Bldg. Corp v. DeHart,*
  13 Wn. App. 489, 535 P.2d 137 (1975) .............................................14

*Quantum Tech. Partners II, L.P. v. Altman Browning & Co.,*
  2009 U.S. Dist. LEXIS 53672 (D. Or. June 29, 2009) .................7, 15, 18, 19

*Quantum Tech. Partners II, L.P. v. Altman Browning & Co.,*
  436 F. App'x 792 (9th Cir. 2011) ...................................................7

*Quinn v. Anvil Corp.,*
  620 F.3d 1005 (9th Cir. 2010) ....................................................*passim*

*Rosenblum v. Sharer,*
  2008 U.S. Dist. LEXIS 65353 (C.D. Cal. July 28, 2008) ..................15, 16, 21

*Scott v. Trans-Sys., Inc.,*
  148 Wn.2d 701, 64 P.3d 1 (2003) .................................................14

*Shwarz v. United States,*
  234 F.3d 428 (9th Cir. 2000) ......................................................17

*Sprewell v. Golden State Warriors,*
  266 F.3d 979 (9th Cir. 2001) ......................................................17

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .......................................................................8

*Stoner v. Walsh,*
    772 F. Supp 790 (S.D.N.Y. 1991) .................................................................21

## STATUTES

RCW 23B.07.400 ..........................................................................................7, 8

RCW 23B.08.010 ...........................................................................................13

RCW 23B.08.320 ...........................................................................................24

RCW 23B.16.020 ...........................................................................................21

## RULES

FRCP 12(b)(6) ..............................................................................................1, 8

FRCP 23.1 ................................................................................................*passim*

## MISCELLANEOUS

Council Regulation 2015/1589, Recital 9, O.J (L 248/9) (EU) ...........................4

Regulation (EU) No 2015/1589, Articles 6 & 7 ..............................................3

Treaty on the Functioning of the European Union, Art. 107 .............................3

Treaty on the Functioning of the European Union Art. 339 .............................19

W. Fletcher, *Private Corporations* §1039 (perm. ed 1974)..............................14

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT   -v-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

Pursuant to Civil Rules 23.1 and 12(b)(6), Nominal Defendant Starbucks Corporation ("Starbucks" or "the Company") moves to dismiss the Complaint.

## INTRODUCTION

Plaintiffs bring this shareholder derivative action purportedly on behalf of Starbucks. They may not proceed with this litigation unless they first satisfy the requirements of FRCP 23.1 and 12(b)(6). Plaintiffs do not have standing to maintain this action because they were not shareholders at the time of the alleged wrongdoing, as required by Rule 23.1. Plaintiffs' litigation demands were duly considered and refused by the Company's Board of Directors, and Plaintiffs have not alleged particularized facts of gross negligence or bad faith necessary to satisfy their burden to overcome the strong presumption of the business judgment rule. For these reasons, the Complaint should be dismissed with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

Starbucks, a Washington corporation headquartered in Seattle, is the premier roaster, marketer and retailer of specialty coffee in the world, employing approximately 238,000 people and operating or licensing over 23,000 stores in 73 countries around the globe, as of 2015. Compl. ¶ 27.[1] The Company pays over a billion dollars annually in corporate income tax (it paid $1.092 billion in FY2014 (Compl. ¶ 72)) and has paid at an effective corporate income tax rate of between 30.1% and 34.6% since FY2008. Ex. G to PEx. C at 13.

Starbucks' Board of Directors is comprised of twelve members, of whom ten are non-management outside directors. Compl. ¶¶ 28, 31-40; DEx. 1. They are highly distinguished individuals, including a former United States Senator[2], a former United States Secretary of Defense and Director of the CIA, the former Vice Chairman of Colgate-Palmolive, the former CEO of Pepsi-Cola, the Chairwoman of DreamWorks Animation, and other leaders in American business and public life. *Id.* Defendants Howard Schultz (Starbucks' CEO), Kevin R.

---

[1] Citations to "Compl." are to the Complaint for Breach of Fiduciary Duties and Unjust Enrichment. (ECF No. 1). Citations to "PEx. __" are to exhibits attached to the Complaint. Citations to "DEx. __" are to the exhibits attached to the concurrently filed Declaration of Elon B. Slutsky ("Slutsky Decl.") dated January 19, 2017.

[2] Senator Bill Bradley is not a defendant in this action.

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

Johnson (Starbucks' President and COO since 2015), Scott Maw (Starbucks' CFO) and Troy Alstead (Starbucks' former CFO) are current and former Starbucks' executives. Compl. ¶¶ 28-31. Mr. Schultz and Mr. Johnson also serve on the Board. Compl. ¶¶ 28, 31.

Beginning in 2001, Starbucks operated several subsidiaries in Europe, including in the Netherlands, where Starbucks had its European headquarters. Compl. ¶ 49; Ex. G to PEx. C at 9. In October 2007, Starbucks Coffee EMEA BV ("SCE"), incorporated in the Netherlands, concluded an advance pricing agreement (the "APA") with the Dutch government—an agreed tax ruling which gave the Company certainty as to the correct methodology for calculating taxes due to the Dutch government over the next ten years. Compl. ¶¶ 8-9. As Plaintiffs' admit, tax rulings of this type are not illegal. Compl. ¶ 65. The Starbucks APA was significant because, as Starbucks' European headquarters, much of Starbucks' EU business was taxed in the Netherlands, and the APA determined appropriate transfer pricing—the tax accounting methodology for allocating the costs of transactions between Starbucks' subsidiaries for tax purposes—under the law of the Netherlands. *Id.*

### Starbucks' Tax Policy Related to the United Kingdom

Plaintiffs claim Starbucks' European tax structures first came under scrutiny in a Reuters article on October 15, 2012. Compl. ¶¶ 4, 52. The article claimed that Starbucks had structured its operations so that its UK profits were taxed in jurisdictions outside the UK. DEx. 2. The Reuters article stated that Starbucks' UK subsidiary had generated little or no profit in the UK and thus paid little UK corporate tax, but noted that "[t]here is no suggestion Starbucks has broken any laws. Indeed, the group's overall tax rate . . . was 31 percent last year, much higher than the 18.5 percent average rate that . . . large U.S. corporations paid in recent years." *Id.* Plaintiffs' claim that the Reuters article increased public scrutiny of Starbucks' tax practices in the UK, caused a public outcry, and prompted the Public Accounts Committee of UK's House of Commons to convene a hearing on November 11, 2012 concerning multinational tax structures at which Mr. Alstead (along with representatives from Google and Amazon) gave testimony. Compl. ¶¶ 5-6, 52-54. At the hearing, the parliamentarians expressed disappointment with the

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

amount of tax paid by multinational corporations in the UK, but repeatedly noted that none of the companies whose representatives testified were being accused of having taken illegal actions. DEx.2 ("There is no suggestion Starbucks has broken any laws."). On December 6, 2012, a few weeks after Mr. Alstead's testimony, Starbucks announced that it would voluntarily pay £10 million in corporate tax in each of 2013 and 2014 regardless of whether the Company turned a profit in the UK. Compl. ¶ 60.

*The European Union and Starbucks' Advanced Pricing Agreement*

Separate from events in the UK, the European Union Directorate General for Competition (the "EC") announced in a press release in June 2014 that it would investigate Starbucks' APA with the Netherlands, along with similar investigations directed at the governments of Luxemburg (regarding Fiat) and Ireland (regarding Apple). Compl. ¶ 63; DEx. 3. The Directorate General is responsible for enforcement of EU competition law and related provisions of the EU's founding treaties in a role roughly analogous to that of the Federal Trade Commission in the United States. The investigations announced in June 2014 were part of a "wider inquiry" by the EC directed at eliminating inconsistency between EU member states' tax practices. DEx. 3. While the EC found differences in the "consistency of the scrutiny by the tax authorities" in EU member states, it noted that the Dutch process was particularly robust: "The Netherlands seem to generally proceed with a thorough assessment based on comprehensive information required from the tax payer." *Id*. at 2. Only the Dutch government, not Starbucks, was a party to the EC proceeding. Compl. ¶ 67; Regulation (EU) No 2015/1589, Articles 6 & 7 (formal investigation of potential state aid is directed at EU member states).

EU member states are generally prohibited from providing state aid to private companies by Article 107 on the Treaty on the Functioning of the European Union. State aid is aid granted by an EU member state which threatens to distort competition "by favouring certain undertakings or the production of certain goods" that affects trade between member states. Compl. ¶ 62. State aid rules prohibit national authorities from unfairly allowing certain companies to pay less tax, thereby providing an advantage over competitors. Compl. ¶ 63. The

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT  -3-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

Directorate General may launch investigations "in order to enable the Commission to gather all the information it needs to assess the compatibility of the [state] aid" with EU internal market principles; such investigations are appropriate "in cases in which a complex substantive assessment appears necessary." Regulation 2015/1589, Recital 9, O.J (L 248/9) (EU).

The EC's investigation into and ultimate decision as to whether the APA constituted state aid turned on the Organization for Economic Cooperation and Development Transfer Pricing Guidelines (the "Guidelines"), which are consensus international tax accounting guidelines for transfer pricing. The Guidelines operate on the "arm's length principle" which states that for tax purposes, profits on intra-corporate transactions should be allocated as though the related corporate entities were dealing at arm's length. DEx. 4. (OECD Guidelines, Definition of "Arm's Length"). The Guidelines themselves recognize that applying the arm's length principle is inherently an exercise in estimation and judgment, especially when there are not transactions between unrelated parties with which to compare. *Id*. at 1.9-1.13. In fact the Guidelines acknowledge that "transfer pricing is not an exact science but does require the exercise of judgment on the part of both the tax administration and the taxpayer." *Id*. at 1.13.

On October 21, 2015, the EC announced its decision against the Netherlands, concluding that the Dutch government had misapplied the Guidelines, resulting in Starbucks paying less tax than the EC believed was proper. Compl. ¶ 66. The highly technical EC Decision concluded that the Dutch government incorrectly applied a transfer pricing method focused on the profits of intra-corporate transactions in place of a method focusing on the sum of intra-corporate cash flows. DEx. 5 at ¶¶ 285-377. Because the APA under-calculated Starbucks' tax obligation, the Directorate General concluded that the Dutch government had improperly granted Starbucks state aid in the APA. *Id*. Neither the Dutch government nor Starbucks was accused of any form of wrongdoing or unethical conduct in the EC Decision, which only ordered the Dutch government to true up Starbucks' underpaid taxes by collecting approximately $34 million in tax from Starbucks for a period dating back to 2008. Compl. ¶¶ 11, 70.

The Dutch government hotly disputed the result. In a November 27, 2015 letter to the

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

Dutch parliament, the Netherlands' two top finance ministers disputed the EC's analysis of the Starbucks APA, stating that because "the Dutch Tax Authorities use internationally recognised methods and the Commission's decision in this case raised many questions, the Cabinet considered itself forced to appeal the decision." DEx. 6. The Dutch government stated that the EC Decision "applies its own criterion for profit calculation which is incompatible with . . . the OECD framework," and caused "confusion and uncertainty" for businesses. *Id.* The letter concluded that the Dutch government "believes the Commission has failed to convincingly prove that the [Dutch] Tax Authorities deviated from statutory regulations and that State aid was provided." *Id.* On December 23, 2015, the Netherlands appealed the EC Decision to the General Court of the European Union where it is currently pending. Compl. ¶ 68.

***Plaintiffs' Litigation Demands***

On December 2, 2015, David Myers made a litigation demand on Starbucks. Compl. ¶ 13. Myers' demand claimed that the EC Decision showed that Starbucks' management had breached a variety of "fiduciary duties" by "employing illegal and artificial methods in order to avoid payment of taxes in the EU," and that Starbucks had suffered damage to its goodwill and reputation in addition to $34 million in taxes the EC had ordered the Netherlands to collect. PEx. A at 16. Myers demanded that the Board launch an investigation into "[m]anagement's violations of Washington law, federal law, and the laws of the EU" and "if warranted, commence a civil action against each member of Management" to recover damages to the Company. *Id.* at 16-17.

On January 27, 2016, Shiva Stein made a litigation demand on Starbucks. Compl. ¶ 13. Stein claimed that the Board had "pursued tax policies of dubious legality that posed unreasonable risks of causing the Company harm in the eyes of governmental authorities and the public alike." PEx. B at 4. Stein demanded that the Board implement a series of corporate governance changes and take "legal action … to recover losses sustained by the Company resulting from the potential violations of tax law" and negative publicity. *Id.* at 1, 4-6.

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT     -5-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

### *The Board Considers Plaintiffs' Litigation Demands*

Upon receipt of Plaintiffs' demand letters (together, the "Demands"), Starbucks informed Plaintiffs that the Board would consider their Demands at an upcoming meeting and invited both Plaintiffs to submit any further information they believed the Board should consider. Neither did. Exs H & I to PEx. C. In advance of a March 22, 2016 Board meeting in which the Board discussed the Demands, the Board was provided with materials related to the Demands, including:

> copies of both demand letters, the materials attached to those demand letters, copies of prior board and audit committee minutes and presentations concerning the Company's European Union corporate structure and corporate tax strategy, news reports and press releases, a transcript of certain testimony before the House of Commons Committee of Public Accounts, the decision by the European Commission, and the subsequent appeal by The Netherlands.

PEx. C at (Resolution) ¶ G. At its meeting, the Board asked questions and discussed the Demands with CFO Maw, Starbucks' Vice President for Tax & Customs, Starbucks' Senior Vice President Global Responsibility & Public Policy, Starbucks' General Counsel, and the Company's outside counsel. PEx. C at (Resolution) ¶¶ G-J. After discussing the Demands in executive session, the Board decided to consider the matter further and made plans to discuss the Demands at its next regularly scheduled meeting on May 10, 2016. *Id.*

After discussing the Demands in the Board's May 10, 2016 meeting, the Board adopted a resolution with respect to the Demands. PEx. C at (Resolution). Based on its review, the Board determined as follows:

> [T]he matters raised by the [Demands] do not demonstrate that any officers or directors of the Company have violated their duties or obligations to the Company or its shareholders. The Board also determined that the matters raised by the [Demands] do not demonstrate that any director's conduct constituted intentional misconduct or a knowing violation of law, the established standards for what conduct cannot be exculpated by the Company's Articles of Incorporation.

> [A]fter careful consideration, the Board has determined that there is no alleged conduct or decision by Company officers or directors that was not a proper action and/or business judgment made in furtherance of the business and affairs of the Company.

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

> The Board, after careful consideration, has determined that there is no merit to the suggestions made in [the Demands] that claims should be made by the Company against Company officers or directors relating to the matters raised in the [Demands].
>
> The Board, after careful consideration, has further decided that it would not be in the best interests of the Company for it to institute litigation or bring claims against any persons for the matters raised in the [Demands].

PEx. C at (Resolution), ¶¶ M-P.  Consequently, the Board refused the Demands.  *Id.* at 4.

By letter dated May 24, 2016, Starbucks notified Plaintiffs of the Board's decision.  This letter attached the Board' resolution concerning the Demands (which quoted from Board minutes summarizing the discussion of the Demands and provided the Board's reasons for rejecting the Demands) and a copy of the presentation provided to the Board in connection with its discussions of the Demands .  PEx.C.

## ARGUMENT

Due to "the extraordinary nature" of a derivative suit, Rule 23.1 establishes "stringent" federal procedural "conditions for bringing such a suit." *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010).  These conditions include a requirement that a derivative plaintiff "state with particularity" the efforts, if any, made by the plaintiff to "obtain the desired action from the directors" and "the reasons for not obtaining the desired action or not making the effort."  FRCP 23.1.  This burden is "more onerous than that required to withstand an ordinary motion to dismiss. . . .  Conclusory allegations of fact or law [which are] not supported by allegations of specific fact may not be taken as true." *Belova v. Sharp*, 2008 U.S. Dist. LEXIS 19880, (D. Or. Mar. 13, 2008) (internal citations omitted); *Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*, 2009 U.S. Dist. LEXIS 53672, at *31 (D. Or. June 29, 2009) (same), *aff'd*, 436 F. App'x 792 (9th Cir. 2011).  This is also a substantive requirement under the Washington Business Corporation Act, which states that a derivative complaint "must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

the demand was refused or ignored or why a demand was not made." RCW 23B.07.400(2).[3]

The Complaint must also satisfy Rule 12(b)(6) by alleging facts that are "plausible" on their face and comply with common sense, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), that rise "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). Conclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss. *See Twombly*, 550 U.S. at 555 (in ruling on motions to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (internal quotation marks and citation omitted). Courts also reject allegations that are contradicted by documents referenced in the complaint or other information subject to judicial notice. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

## I. THE COMPLAINT MUST BE DISMISSED PURSUANT TO FRCP 23.1 BECAUSE PLAINTIFFS WERE NOT STARBUCKS SHAREHOLDERS AT THE TIME OF THE ALLEGED WRONGDOING

Derivative lawsuits are subject to the procedural requirements of Rule 23.1 of the Federal Rules of Civil Procedure. *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208-10 (9th Cir. 1980) (affirming dismissal of derivative action for failure to comply with Rule 23.1). Rule 23.1 requires a plaintiff asserting a derivative claim to plead that he or she "was a shareholder . . . at the time of the transaction complained of. . . ." FRCP 23.1(b)(1).[4] Rule 23.1 therefore requires a derivative plaintiff to have been "a shareholder at the time of the alleged wrongful acts" in order to have standing; he or she cannot pursue claims on behalf of the corporation for wrongdoing that occurred prior to the time that plaintiff owned company stock. *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983); *Quinn*, 620 F.3d at 1012 (same); *In re Facebook, Inc., IPO Deriv. Litig.*, 797 F.3d 148, 157 (2d Cir. 2015) (Rule 23.1 requires "possession of an ownership

---

[3] Starbucks is incorporated in Washington, Compl. ¶ 27, and therefore Washington substantive law applies. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999) (law of state of incorporation governs derivative claims). Washington courts look to Delaware courts for authority on some matters of corporate governance, including derivative litigation. *See In re F5 Networks, Inc.*, 166 Wn.2d 229, 239, 207 P.3d 433 (2009) (looking to Delaware law on derivative litigation for guidance in the absence of Washington law).

[4] This is also a substantive requirement under the Washington Business Corporation Act, which states that "[a] person may not commence a proceeding in the right of a domestic or foreign corporation unless the person was a shareholder of the corporation when the transaction complained of occurred. . . ." RCW 23B.07.400(1).

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

interest in the company [plaintiff] seeks to represent that is contemporaneous with the conduct for which [plaintiff] seeks recovery"); *In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010) (dismissing complaint because plaintiffs did not own shares "throughout the entire period of Defendants' alleged wrongdoing"). This is known as the "contemporaneous ownership" requirement. *Facebook*, 797 F.3d at 157; *Quinn*, 620 F.3d at 1012.

Here, Plaintiff Myers has been a Starbucks shareholder since October 2013. Plaintiff Stein has been a Starbucks shareholder since June 2014. Compl. ¶¶ 25-26. The core wrongdoing alleged in the Complaint and for which these two Plaintiffs sue on behalf of the Company—that "Defendants breached their fiduciary duties of care and loyalty when they created artificial and illegal tax structures that aggressively avoided paying taxes in the EU" (Compl. ¶ 98)—occurred long before Plaintiffs became shareholders of Starbucks.[5]

*First*, Plaintiffs allege that Defendants implemented a "complex and opaque business structure" to help Starbucks "insulate its corporate tax scheme from public or regulatory scrutiny." Compl. ¶ 51. As the Complaint alleges and documents incorporated by reference in the Complaint show, this corporate structure was implemented long before October 2013 when Myers became a shareholder. Compl. ¶¶ 49-51. SCE was established in the Netherlands in 2001. Ex. G to PEx. C at 9. Starbucks Manufacturing EMEA BV ("SME") was formed in the Netherlands in 2002. *See id*. The Starbucks Coffee Trading Company ("Swiss Subsidiary) also was formed in 2002. *See id*. at 10. And Alki LP was formed in 2007. *See id*. at 9.

*Second*, Plaintiffs allege that Defendants caused Starbucks' Dutch subsidiaries to enter into the APA with the Netherlands—an agreement the EC has since deemed "state aid" that violates the EU Treaty among member states. Compl. ¶¶ 8-10. However, the Netherlands issued the Starbucks APA in October 2007, over six years before Plaintiffs became Starbucks shareholders. Compl. ¶¶ 8-9.

---

[5] Evidently aware of this difficulty, the Complaint contains an arbitrary "Relevant Period" beginning in 2013, but does not even attempt to justify or explain this selection. Compl. ¶ 1. In fact, the Complaint devotes a great deal more space discussing its core pre-2013 allegations of wrongdoing, than its unclear and confused 2013-to-present allegations of false financial statements and failure to disclose the EC and parliamentary proceedings.

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

*Third*, Plaintiffs allege that the EC has required the Netherlands to collect from Starbucks $34 million in corporate taxes the Company should have paid over a seven year period from 2008 through 2014, plus interest, but for the misapplication of the OECD Guidelines in the APA. Compl. ¶ 11; Ex. G to PEx. C at 14. This, of course, means that at least five out of the seven years of additional Dutch taxes the EC has required Starbucks to pay covers a time period (2008 – 2012) in which neither Plaintiff was a Starbucks shareholder.

*Fourth*, Plaintiffs allege that Defendants' scheme caused Starbucks to pay no corporate tax in the UK between 2009 and 2012, which resulted in public outcry, parliamentary hearings, and Starbucks' volunteering to pay £10 million in corporate taxes to the UK in each of 2013 and 2014. Compl. ¶¶ 52-61. The problem for Plaintiffs is that the Complaint's entire series of UK-related allegations occurred before Plaintiffs became Starbucks shareholders. Starbucks' low corporate tax payments in the UK came to light in October 2012. Compl. ¶ 52. The parliamentary hearings were held in November 2012. Compl. ¶ 54. And Starbucks' volunteered to pay additional UK corporate taxes in December 2012. Compl. ¶ 60. Even the alleged negative impact of the tax publicity on Starbucks' UK sales is quantified by Plaintiffs with respect to sales through the end of September 2013, the month before Plaintiff Myers became a shareholder. Compl. ¶ 61.

Plaintiffs undoubtedly will attempt to argue in response that at least some of the alleged wrongdoing occurred after they became shareholders. They may contend that SME and the Swiss Entity still exist,[6] that the APA resulted in the underpayment of corporate taxes to the Netherlands in 2013 and 2014,[7] or that some of the allegedly false financial statements or omissions were in 2013 and 2014.[8] This is insufficient. A derivative plaintiff lacks standing

---

[6] But what matters is *when* those entities were created, not that they continue to exist. Besides, the Complaint alleges that Starbucks has moved its EU headquarters from Amsterdam to London (Compl. ¶ 60), and the documents incorporated by reference and attached to the Complaint show that Alki LP has been replaced with EMEA Ltd., a new EMEA holding company incorporated in the UK and subject to UK corporate tax at 20%. Ex. G to PEx. C at 9.

[7] The non-payment of corporate taxes is an *effect* of the implementation of the corporate structure and Dutch APA that are the core allegations of the Complaint. Ongoing effects do not constitute wrongdoing for purposes of the continuous ownership requirement. *See supra* at 12-13.

[8] Plaintiffs claim that the Starbucks 10-Ks since 2008 were misleading because (a) they failed to disclose the pendency of the EC investigation and (b) they did not disclose an approximately $34 million tax liability resulting

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

even if he or she owned shares during a portion of the alleged wrongdoing. A plaintiff "must have owned stock in the corporation throughout the course of the activities that constitute the *primary basis* of the complaint." *In re Bank of N.Y. Deriv. Litig.*, 320 F.3d 291, 298 (2d Cir. 2003) (emphasis in original). Put differently, they must have acquired their stock "before the core of the allegedly wrongful conduct transpired." *Id.* A few examples of how courts have employed the continuous ownership requirement are instructive.

In *In re Bank of New York Derivative Litigation*, the derivative plaintiffs alleged that defendants breached their duties to the Bank of New York by aggressively expanding the bank into the highly risky business of correspondent banking with Russian financial institutions and other business that resulted in accounts being used to launder money. *See id.* at 299. The Second Circuit affirmed the district court's dismissal due to a lack of continuous ownership. In doing so, the court concluded that the "expansion occurred primarily between 1992 and 1996" even though new Russian correspondent accounts continued to be opened and accounts continued to receive laundered money after plaintiffs acquired their stock in 1998. *Id.* at 301.

In *In re Facebook, Inc. IPO Derivative Litigation*, the derivative plaintiff alleged that defendants breached their duties to Facebook by authorizing the issuance of a registration statement for Facebook's IPO that failed to disclose the impact of mobile usage on the company's projected growth. 797 F.3d at 151. The Second Circuit affirmed the district court's judgment that plaintiff did not have continuous ownership because the "primary basis" of the

---

from the EC Decision. Compl. ¶¶ 69, 74-75. As an initial matter, all but two of the seven 10-Ks were issued *before* Plaintiffs became shareholders. And a failure to include a footnote or a line item in a financial statement is far from "the core activity" alleged in the Complaint that caused the purported need for such disclosures in the first place. *Facebook*, 797 F.3d at 160.

Plaintiffs' first contention, (a) above, is flawed because, the Complaint asserts that the EC investigation was announced in June 2014 via press release. Compl ¶ 2. The Complaint does not allege that Defendants were even aware of the investigation prior to the public announcement. Compl. ¶¶ 62-68.

Plaintiff's second contention, (b) above, fails because the tax liability did not exist until the EC Decision in November 2015 created it. As such there was nothing to disclose in Starbucks 10-Ks for fiscal years 2008 to 2014, and Starbucks disclosed the EC Decision and liability in its 2015 10-K. Compl. ¶¶ 74-75. The additional $34 million tax liability was not material relative to the billions of dollars in taxes Starbucks paid over the same time. For example, Starbucks had an income tax expense of $1.092 billion in FY2014. Compl. ¶ 72. As a result, even if the Defendants had predicted the result of the EC Decision (Plaintiffs do not allege that they did), failure to disclose the liability could not have been materially misleading.

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

complaint was a registration statement deemed effective by the SEC before the IPO through which plaintiff purchased her shares, even though the registration statement was deemed effective shortly before the IPO, along with the prospectus, constituted the offering documents connected to the shareholder plaintiff's purchase. *See id.* at 160.

In *Belova v. Sharp*, the derivative plaintiffs alleged that defendants breached their duties to the company by backdating stock options to officers and directors from 1998 through 2002. 2008 U.S. Dist. LEXIS 19880, at *10. Judge Mosman dismissed the complaint for lack of continuous ownership even though the plaintiffs stated in their opposition to the motion that they became shareholders in 1999 and 2000. *See id.* at *9-10, 12. In doing so, the court stated that plaintiffs "'must [particularly] allege contemporaneous ownership" during "all periods relevant to the . . . transactions." *Id.* at *10 (quoting *In re Computer Scis. Corp. Deriv. Litig.*, 2007 U.S. Dist. LEXIS 25414, at *15 (C.D. Cal. Mar. 26, 2007), *aff'd sub nom, Laborers v. Bailey*, 310 F. App'x 128 (9th Cir. 2009)).

In *In re Accuray, Inc. Shareholder Derivative Litigation*, the derivative plaintiffs alleged that defendants made misrepresentations about the company's revenues and backlog from February 7, 2007, the day of the company's IPO, to January 2009. 757 F. Supp. 2d at 923, 926. Judge Wilken dismissed the complaint based upon a lack of continuous ownership even though the three plaintiffs purchased company stock in August 2007 and January 2008. *See id.* at 926.[9]

Plaintiffs may attempt to argue that Starbucks has suffered continuing harm in the form of reputational damage in Europe as a consequence of the alleged tax scheme after they became owners. However, in analyzing whether derivative plaintiffs satisfy the contemporaneous ownership requirement "the determinative issue is when the specific acts of alleged wrongdoing occur, and not when their effect is felt." *In re Bank of N.Y. Deriv. Litig.*, 173 F. Supp. 2d 193,

---

[9] In *Chirlin v. Crosby*, the derivative plaintiff alleged that the chairman of a resort company usurped a corporate opportunity in 1966 to build a toll bridge connecting the company's Bahamas hotel on Paradise Island with Nassau. 1982 Del. Ch. LEXIS 492, at *2 (Del. Ch. Dec. 7, 1982). The Delaware Court of Chancery dismissed the complaint for a lack of contemporaneous ownership even though the bridge company the chairman set up to build and operate the bridge continued to receive toll payments for the bridge, the chairman acquired additional shares in the bridge company, and ultimately sold his majority interest in the bridge company, all after plaintiff purchased shares in the resort company in 1978. *See id.* at *6.

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT   -12-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

198 (S.D.N.Y. 2001), *aff'd*, 320 F.3d 291, 298 (2d Cir. 2003); *Chirlin v. Crosby*, 1982 Del. Ch. LEXIS 492, at *5 (Del. Ch. Dec. 7, 1982) (same).

Plaintiffs' failure to satisfy the continuous ownership requirement of Rule 23.1 requires dismissal of the complaint with prejudice. If Plaintiffs "cannot properly act in a derivative capacity, the suit would not exist (at least not as brought by these plaintiffs)." *Facebook*, 797 F.3d at 157. A "derivative plaintiff who has not satisfied this requirement is no proper party, whatever the merits of the underlying claims." *Id. See also Bank of N.Y.*, 320 F.3d at 299; *Quinn*, 620 F.3d at 1012-13 (rejecting any notion of an equitable exception to the continuous ownership requirement).

## II. THE DECISION TO FILE A LAWSUIT ON BEHALF OF THE COMPANY BELONGS TO THE BOARD OF DIRECTORS, NOT PLAINTIFFS

It is a fundamental tenet of Washington law that the "business and affairs of the corporation shall be managed under the direction of the board of directors, which shall have exclusive authority as to the substantive decisions concerning management of the corporation's business." RCW 23B.08.010(2)(b). It is equally well settled that this authority extends to the decision over whether to file a suit on behalf of the corporation. *See F5 Networks*, 166 Wn.2d at 236 ("[T]he corporation's board and officers manage the corporation and make decisions like whether to file a lawsuit."); *In re Cray Inc. Deriv. Litig.*, 431 F. Supp. 2d 1114, 1120 (W.D. Wash. 2006) (a "'decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation.'") (quoting *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991)).

Just because a derivative complaint has been filed, does not "establish the propriety of the action or the necessity of for its continued maintenance." *Goodwin v. Castleton*, 19 Wn.2d 748, 763, 144 P.2d 725 (1944). Shareholder plaintiffs "not only have the burden of proving the material charges entitling the corporation itself to recover, but they must also establish the grounds entitling them to sue in place of the corporation." *Id.* at 763-64. Since they wrest control of the corporation away from the board, shareholder derivative actions "are disfavored and may

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT  -13-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

be brought only in exceptional circumstances," *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 147, 744 P.2d 1032 (1987), as a "remedy of last resort." *Quinn*, 620 F.3d at 1012. These exceptional circumstances only exist when the directors are "acting fraudulently or collusively among themselves or with others, in such a manner as will result in serious injury to the corporation or to the interests of its stockholders. . . ." *Goodwin*, 19 Wn.2d at 761. Accordingly, procedural and substantive law contain safeguards governing whether and how such extraordinary suits should be allowed to proceed, including the demand requirement. *See F5 Networks*, 166 Wn.2d at 236-40 (power to bring a derivative suit "is not unfettered; shareholders must do more than simply assert a corporation's rights").

Here, Plaintiffs do not allege any fraudulent or collusive action by Starbucks' directors; neither do they allege any serious injury to Starbucks. *See supra* at 1-5 and *infra* 16-18. Thus, they have not established the failure of corporate governance mechanisms that is a necessary predicate to their derivative action.

## III. THE BUSINESS JUDGMENT RULE PROTECTS THE BOARD'S DECISION NOT TO PURSUE THE CLAIMS ASSERTED IN THIS LITIGATION

The business judgment rule is a standard of judicial review that protects the decisions of a company's directors and officers from judicial scrutiny. "The business judgment rule cautions against courts substituting their judgment for that of the board of directors, absent evidence of fraud, dishonesty, or incompetence." *Davis v. Cox*, 180 Wn. App. 514, 535, 325 P.3d 255 (2014) (citing *In re Spokane Concrete Prods., Inc.*, 126 Wn.2d 269, 279, 892 P.2d 98 (1995)), *rev'd on other grounds*, 183 Wn.2d 269, 351 P.3d 862 (2015); *Nursing Home Bldg. Corp v. DeHart*, 13 Wn. App. 489, 498-99, 535 P.2d 137 (1975) ("[T]he law will not hold directors liable for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith") (quoting W. Fletcher, *Private Corporations* §1039 (perm. ed 1974); *Scott v. Trans-Sys., Inc.*, 148 Wn.2d 701, 709, 64 P.3d 1 (2003) (under the business judgment rule corporate management "immunized from liability" when "there is a reasonable basis to indicate" that management's decision "was made in good faith."). The rule creates a rebuttable presumption "that in making a

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT      -14-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 1998). It recognizes that even the best of directors and officers, who in good faith fully comply with their duties, may make decisions that in hindsight turn out to be incorrect and result in losses to the company. *See, e.g., In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009) ("To impose liability on directors for making a 'wrong' business decision would cripple their ability to earn returns for investors by taking business risks.").

Under the business judgment rule, a board's refusal to initiate litigation in response to a shareholder demand is entitled to the same broad deference and judicial restraint as other corporate decisions. *See, e.g., In re Merrill Lynch & Co. Sec., Deriv. & ERISA Litig*, 773 F. Supp. 2d 330, 345 (S.D.N.Y. 2011), *aff'd sub nom, Lambrecht v. O'Neal*, 504 F. App'x 427 (2d Cir. 2012) ("board's decision to reject a demand is entitled to the benefit of the business judgment rule"); *Knopf v. Semel*, 2010 WL 965308, at *7 (N.D. Cal. Mar. 17, 2010) (same); *Quantum*, 2009 U.S. Dist. LEXIS 53672, at *29 (same); *Rosenblum v. Sharer*, 2008 U.S. Dist. LEXIS 65353, at *13 (C.D. Cal. July 28, 2008) (same). Even where claims have merit (the claims here do not), a board has discretion to refuse to sue because it believes litigation is not in the best interests of the corporation. *See In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007) ("[a] board may in good faith refuse a shareholder demand to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits."). As explained by the Washington Supreme Court:

> [t]he mere fact that a corporation has a cause of action for an injury does not always make it incumbent upon it to sue, any more than in the case of an individual. If, in the opinion of the directors . . . the best interests of the company do not require it to sue, it need not do so. . . . The exercise of such discretion by the directors will not be lightly set aside by the court, and where a stockholder complains of such action of the directors the court will consider the circumstances, and, if no bad faith is shown, will decline to substitute the judgment of the stockholder for that of the managing directors.

*Goodwin*, 19 Wn.2d at 762-63.

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

# IV. PLAINTIFFS' ALLEGATIONS FAIL TO OVERCOME THE PRESUMPTION OF GOOD FAITH UNDER THE BUSINESS JUDGMENT RULE

Plaintiffs have not rebutted the strong presumption of the business judgment rule, as is their burden. *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 807 F.3d 502, 505 (2d Cir. 2015). By making the Demands on the Board before filing suit, Plaintiffs have conceded the independence and disinterestedness of a majority of the Board. *Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991); *Friedman v. Maffei*, 2016 Del. Ch. LEXIS 63, at *23-24 (Del. Ch. Apr. 13, 2016); *Knopf*, 2010 WL 965308 at *7; *Rosenblum*, 2008 U.S. Dist. LEXIS 65353, at *20. Thus, to establish wrongful refusal, a plaintiff must plead with particularity facts "that the investigation at issue . . . was reasonable and conducted in good faith." *Knopf*, 2010 WL 965308 at *7; *Rosenblum*, 2008 U.S. Dist. LEXIS 65353, at *20 (same); *Baron v. Siff*, 1997 Del. Ch. LEXIS 152, at *5 (Del. Ch. Oct. 17, 1997) (same). Plaintiffs have failed to do so.

## A. Plaintiffs' Allegations Do Not Come Close to Showing the Overwhelmingly Obvious Merits of Their Claims, As Required

In connection with a Rule 23.1 motion to dismiss, a court "considers a complaint's underlying claims for a narrow purpose—to determine whether the merits of those claims are so *overwhelmingly obvious* that the board's decision not to pursue them *must have been made in bad faith*." *Maffei*, 2016 Del. Ch. LEXIS 63, at *31 (emphasis added). Here, the merits of Plaintiffs' claims of wrongdoing are far from overwhelmingly obvious. The opposite is true.

Plaintiffs' core allegation is that Defendants participated in a scheme to lower Starbucks' tax burden in the UK, specifically, and European Union, generally, using various corporate subsidiaries and an APA with the Netherlands. As with individuals, minimizing tax exposure is a valid business objective for corporations. In fact, a "failure to minimize taxes could be a breach of fiduciary duty under certain circumstances." *Hawkins v. MedApproach Holdings, Inc.*, 2014 U.S. Dist. LEXIS 111428, at *28-29 (S.D.N.Y. Aug. 11, 2014); *E*Trade Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 377 (S.D.N.Y. 2009) (company has a "duty to its shareholders . . . to minimize its tax exposure as permitted by law."), *aff'd*, 374 F. App'x 119 (2d Cir. 2010). Due to the complexities related to a corporation's tax policy, particularly a

corporation the size of Starbucks with a large international presence, Plaintiffs should not be second-guessing Defendants' decision-making in this area. As one court has put it:

> Tax strategy is a complex, dynamic area of corporate decision-making that affects and is affected by many other aspects of a company. A company's tax policy may be implicated in nearly every decision it makes, including decisions about its capital structure, the legal forms of the various entities that comprise the company, which jurisdictions to form these entities in, when to purchase capital goods, whether to rent or purchase real property, where to locate its operations, and so on. Minimizing taxes can also require large expenditures for legal and accounting services and may entail some level of legal risk. As such, *decisions regarding a company's tax policy are not well-suited to after-the-fact review by courts and typify an area of corporate decision-making best left to management's business judgment*, so long as it is exercised in an appropriate fashion.

*Freedman v. Adams*, 2012 Del. Ch. LEXIS 74, at *45-46 (Del. Ch. Mar. 30, 2012) (emphasis added), *aff'd*, 58 A.3d 414 (Del. 2013).

As shown above in the factual background section, *supra* at 1-7, there is no allegation (nor could there be) that the creation of SME, SCE, Alki LP or the Swiss Entity was illegal. With respect to the UK, the House of Commons did not accuse Starbucks of having taken illegal actions. And the October 2012 Reuters article cited in the Complaint states that "[t]here is no suggestion that Starbucks has broken any laws" and that Starbucks' tax structure "sheds light on *perfectly legal* tactics used by multinationals the world over." DEx. 2 (emphasis added).[10] Plaintiffs admit that tax rulings or advanced pricing agreements between corporations and governmental tax administrators are not illegal. Compl. ¶ 65. While the EC Decision did conclude that the Netherlands had incorrectly applied a transfer pricing method to the Starbucks APA in violation of EU state aid rules, it did not conclude that Starbucks or any of its directors or officers had engaged in intentional misconduct or wrongdoing. And even the EC Decision's conclusion is uncertain since the Netherlands has appealed the EC Decision to the General Court

---

[10] "[T]he court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court and may consider documents that are referred to in the complaint whose authenticity no party questions." *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). Neither should the Court accept as true "unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT   -17-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

of the European Union.  Besides, a company paying an effective corporate income tax rate of between 30.1% and 34.6% since FY2008 does not indicate a company cheating on its taxes.

Assuming the EC Decision is affirmed, Defendants at worst embarked on a EU tax policy and entered into an agreement with the Dutch tax authority that caused the Company to underpay its Dutch taxes by $34 million from 2008-2014.  With the exception of the interest, the $34 million Starbucks must now pay is not a harm to the Company since it would have been paid previously but for the APA.[11]  This is nothing relative to the over $1 billion in taxes Starbucks pays annually.  Compl. ¶ 72.  Plaintiffs also allege reputation harm to Starbucks' business as a result of the negative publicity surrounding the UK parliamentary hearings and the EC Decision. But such damages are not quantified or quantifiable.  *Cf Cray*, 431 F. Supp. 2d at 1134 (dismissing derivative complaint because "lost goodwill and business reputation damage allegations must be more than speculative and conclusory").

**B.      Plaintiffs' Allegations Do Not Create a Reasonable Doubt As to the Sufficiency of the Board's Investigation of Plaintiffs' Demands**

Plaintiffs allege that the Starbucks Board wrongfully refused their Demands because the Board did not properly investigate, or report on its investigation of, the claims asserted in the Demands.  Compl. ¶¶ 81-87.  But it is well-settled law that "there is no prescribed procedure or form a Board must follow when responding to a demand letter." *Merrill Lynch*, 773 F. Supp.2d at 349; *Levine*, 591 A.2d at 214 (same); *Espinoza,* 801 F.3d at 508 (quoting *Levine*); *Baron*, 1997 Del. Ch. LEXIS 152, at *10 (same).  There is "no single blueprint."  *Espinoza*, 807 F.3d at 507.  "[A]n investigating board generally is under no obligation to make use of any particular investigative technique." *Quantum*, 2009 U.S. Dist. LEXIS 53672, at *30-31 (internal quotations and citation omitted); *Halpert Enters. v. Harrison*, 2008 U.S. App. LEXIS 22557, at *5 (2d Cir. Oct. 15, 2008) (same).  Even Plaintiffs admit that boards are "afforded wide latitude in how they

---

[11] The Demands do not explain how the fact that the EC Decision in 2015 made it wrongful or illegal for Starbucks to do business under the APA, which was a final, official ruling from the Dutch Government, in 2007-14. *See In re Open Joint Stock Co. "Vimpel-Commc'ns" Sec. Litig.*, 2006 U.S. Dist. LEXIS 10256, at *20-21 (S.D.N.Y. Mar. 14, 2006) (allegations fail to show how company could have known it owed back taxes before receiving preliminary notice from Russian tax officials).

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT      -18-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

conduct their investigation...." Compl. ¶ 81. The bottom line is that the "selection of appropriate investigative methods must always turn on the nature and characteristics of the particular subject being investigated." *Auerbach v. Bennett*, 47 N.Y. 2d 619, 636 (1979).

**Interviews**. Plaintiffs criticize the Board's investigation for failing to conduct interviews, particularly interviews of members of British Parliament, the European Commission or the Directorate General.[12] Compl. ¶¶ 18, 20, 84-85. However, "there is no rule of general application that a board must interview every possible witness who may shed some light on the conduct forming the basis of the litigation." *Quantum*, 2009 U.S. Dist. LEXIS 53672, at *31. "*In fact, there is not any rule that requires a board to interview anyone.*" *Id* (emphasis added) (citing *Levine*); *Levine*, 591 A.2d at 214 (board did not wrongfully refuse demand when board did not conduct any interviews).[13] Regardless, the Starbucks Board did conduct interviews. As the excerpts of the minutes of the Board's March 22, 2016 meeting show, the Board personally discussed the Demands' allegations with Starbucks' CFO (Defendant Maw), Senior Vice President of Global Responsibility & Public Policy, Vice President of Tax & Customs, and General Counsel. PEx. C (Resolution) at ¶ H.

**Materials**. Plaintiffs complain that the Board did not review documents in connection with its investigation sufficient to inform itself. Compl. ¶ 18. But the Board reviewed numerous documents, including both Demands, all materials included or cited in those Demands, copies of prior Board and Audit Committee minutes and presentations concerning Starbucks' European Union corporate structure and corporate tax strategy, news reports and press release regarding

---

[12] There is no reason to believe that members of the EC would voluntarily discuss the EC Decision with Starbucks' Board or submit to an interview, especially considering that its decision is currently under appeal. As demonstrated by the text of the EC Decision, the EC operates under highly formalized rules that make it highly unlikely that its members would engage in discussion of its activities. *See generally*, TFEU Art. 339 ("members of the institutions of the Union . . . shall be required, even after their duties have ceased, not to disclose information of the kind covered by the obligation of professional secrecy").

[13] In *Barovic v. Ballmer*, 72 F. Supp. 3d 1210 (W.D. Wash. 2014), the EC actively investigated and concluded that Microsoft engaged in wrongful conduct by removing an internet browser choice feature that allowed purchasers of Windows to select from among various browsers, not just Internet Explorer, in violation of a settlement order entered in a massive antitrust case against the company in the EU. As a result of its investigation, the EC fined Microsoft €561 million for the violation. This is far different from the EC Decision regarding whether the Netherlands tax authority issued an APA or tax ruling that did not comply with the EC's interpretation of the OECD Guidelines. As explained above, the EC did not investigate wrongdoing at Starbucks; it investigated economic facts concerning the APA.

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

the Company's tax practices, a transcript of the testimony before British Parliament, a copy of the 101-page EC Decision, the subsequent appeal by the Netherlands, relevant legal standards for director and officer conduct, a history of the Company's EMEA corporate structure and transaction flows over time, and a summary of the results of Starbucks' tax policy from 2008 through 2015, including tax savings from its EMEA tax policy and the Company's overall effective tax rate. Compl. ¶ 18; PEx. C (Resolution) at ¶ G. Such information is more than sufficient for the Board to properly inform itself with respect to the Demands.

Moreover, the materials Plaintiffs rely on in their Complaint make clear that the Board was already well informed concerning the subject matter of the Demands. *Merrill Lynch,* 773 F. Supp. 2d at 349 (Board need not conduct new investigation when it was already "already quite familiar with the allegations in" demand). For example, Plaintiffs cite a June 5, 2012 and March 18, 2014 "Tax and Customs" update to the Board's Audit Committee which lay out Starbucks' European corporate structure and quantifies the resulting tax savings to Starbucks. Compl. ¶¶ 49-51 & n.9-12.

***Counsel.*** Plaintiffs criticize the Board's investigation because it did not retain independent counsel. Compl. ¶ 86. In the context of a shareholder demand, the concept of "independent counsel" refers to counsel advising an independent litigation committee of the board, also known as a special litigation committee, delegated the task of investigating a demand. *Espinoza*, 807 F.3d at 507. Formation of such a committee is not required, and the Board did not do so here. *Stoner v. Walsh,* 772 F. Supp 790, 800 (S.D.N.Y. 1991) (board not obligated to form a committee in response to a demand).[14] Here, since there is no allegation that the Board delegated its investigation responsibilities to counsel (because they did not), independent counsel is not required. *Baron*, 1997 Del. Ch. LEXIS 152 at *7 n.13. Indeed, there is no requirement that the Board retain any counsel in connection with an investigation of a demand. *Levine*, 591 A.2d at 214 (upholding refusal of demand when board did not retain counsel). The Board was

[14] Indeed, as shown *supra* at 16-21 and *infra* 21-22, Plaintiffs conceded that a majority of the Starbucks' Board is independent and disinterested when they served their Demands on the Board. *Knopf*, 2010 WL 965308 at *7.

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT    -20-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

advised by Starbucks' General Counsel and by counsel at Wilson Sonsini Goodrich & Rosati ("WSGR"), a law firm that is not Starbucks' outside corporate or tax counsel. Compl. ¶ 86. There is no allegation (nor could there be) that WSGR was not capable or acted in any manner other than professionally. This obviates the need to question the selection of counsel. *Grafman v. Century Broad., Inc.*, 762 F. Supp. 215, 220 (N.D. Ill. 1991) (declining to question selection of counsel where "no indication that hired counsel acted in any manner other than professionally and independently"). In fact, in *Sharer*, the court held that a refusal of a demand was not wrongful despite the fact that company refused to identify which counsel and what role they played in assisting with the demand. 2008 U.S. Dist. LEXIS 65353, at *21.[15]

***Refusal Letter and Report***. Plaintiffs complain that the Board's refusal letter provided scant information and that the Board either did not create or did not produce a report, all in an attempt to "unreasonably insulate" their investigation from scrutiny. Compl. ¶ 81. The Board, however, was not required to send Plaintiffs "a detailed letter explaining its refusal with a point-by-point response to each of the . . . claims he raised in his demand letter." *Espinoza* 807 F.3d 507 (four-page refusal letter "far exceeded the minimum required"). In *Levine*, the Delaware Supreme Court found that a five-line refusal letter was sufficient, even though the board did not provide any additional information by way of documents, minutes or a report. *Levine*, 591 A.2d at 214. Here, the Board not only provided Plaintiffs with a letter notifying them of the Board's refusal of their Demands, but it also provided Plaintiffs a copy of the Board's resolution that included excerpts of minutes, references to the Board's process and reasons for its decision, and a copy of a presentation provided to the Board in connection with its consideration of the Demands. This was far more than is required.[16]

---

[15] Plaintiffs make a similar claim that the Board failed to retain an independent tax expert. Compl. ¶¶ 18, 82. This allegation fails for the same reasons as that concerning counsel.

[16] The Board's disclosure to Plaintiffs in response to their Demands exceeded the scope of disclosure of Board documents to shareholders required by Washington law. *See* RCW 23B.16.020(2)(a) (limiting shareholders' right of access to corporate records through inspection demands to excerpts of board and committee minutes and records of corporate actions approved by the board without a meeting.)

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT    -21-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

With respect to a report, there is no requirement that a board create or produce a copy of the report to the shareholder making the demand. There was no written report in *Levine*, and the court still held that the board's refusal of the demand was protected by the business judgment rule. 591 A.2d at 214; *Gatz v. Ponsoldt*, 2004 Del. Ch. LEXIS 203, at *20-21 (Del. Ch. Nov. 5, 2004) (no report from investigation in response to a demand is required, and failure to generate a report does not rebut presumption of business judgment rule). As one court has noted, failure to disclose an investigative report "to a derivative plaintiff does not, as a general proposition, evidence wrongful refusal of demand." *Boeing Co. v. Shrontz*, 1994 Del. Ch. LEXIS 14, *12 (Del. Ch. Jan. 19, 1994).

### C. Plaintiffs' Allegations Do Not Show That the Board's Refusal of the Demands Was Inexplicable, Grossly Negligent, Lacking a Rational Purpose or Otherwise in Bad Faith

In order to meet their burden on this motion to dismiss, Plaintiffs must plead sufficient facts creating a plausible inference that the Board's investigation and refusal of the Demands was grossly negligent. *Espinoza*, 807 F.3d at 506; *Knopf*, 2010 WL 965308 at *7. Gross negligence has been defined as "conduct that constitutes reckless indifference or actions that are without the bounds of reason." *Espinoza*, 807 F.3d at 506 (citations omitted). Rebutting the business judgment presumption protection of a board's refusal of a demand requires plaintiffs to plead particularized facts indicating that the refusal was "so inexplicable that a court may reasonably infer that the directors must have been acting for a purpose unaligned with the best interest of the corporation; that is, in bad faith." *Maffei*, 2016 Del. Ch. LEXIS 63 at *27 (internal quotations and citation omitted); *Furman v. Walton*, 2007 U.S. Dist. LEXIS 39618, at *8 (N.D. Cal. 2007) (to rebut presumption, refusal must be such that it "cannot be attributed to a rational business purpose"). "[F]ew, if any, plaintiffs surmount this obstacle." *Espinoza*, 807 F.3d at 506 (citations omitted). Plaintiffs have not done so here.

The Board conducted an investigation commensurate with the scope of the Demands. *See supra* at 1-7. Indeed, the Board's resolution refusing Plaintiffs' Demands shows that the Board deliberated reasonably in reaching its decision. The Board discussed the Demands at two

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

separate Board meetings only after receiving hundreds of pages of materials. The Board personally discussed and asked questions concerning the allegations in the Demands of Starbucks' CFO, Senior Vice President for Global Responsibility & Public Policy, Vice President of Tax & Customs, General Counsel and counsel at WSGR. The Board also adopted a detailed resolution that summarized its investigation and its reasons for rejecting the Demands.[17] This is more than sufficient.

Courts have upheld refusals and dismissed derivative complaints that involved investigations far less fulsome than the one the Board conducted here. For example, in *Levine v. Smith*, 591 A.2d at 212-215, the Delaware Supreme Court affirmed the lower court's decision to uphold a refusal even though there was no indication that the board actually met to discuss the demand, no formal board action refusing the demand, no report reflecting the board's findings and conclusion, and no real indication of what information the board considered in reaching its decision to refuse the demand. In *Baron v. Siff*, 1997 Del. Ch. LEXIS 152, at *2, 7, 12, the Delaware Court of Chancery granted defendants' motion to dismiss a derivative suit involving a board's refusal of a demand nine days after it was received in a letter that did not even indicate whether the board held a meeting to discuss the demand. In *Merrill Lynch*, 773 F. Supp. 2d at 345-51, the district court dismissed a demand-refused derivative action in which the board commenced and concluded its consideration of the demand in one meeting, did not create a report, and wrote a boilerplate refusal letter.

The reasons the Board refused the Demands also indicate the reasonableness of the Board's refusal. Not only did the Board conclude that no directors or officers violated their duties or obligations to the Company with respect to the Company's tax policy, the Board also

---

[17] Plaintiff's allegation that "[s]ince the Board concluded that the Demand should not be accepted, it did not undertake an investigation," Compl. ¶ 82, is a red herring. The reference to a broad "independent investigation" into potential violations of not just EU law, but also federal and Washington State law conveyed one of Myers' demands. Plaintiffs seek to conflate Myers' Demand with the fact finding necessary to make a business judgment as to whether the Company should act on his Demand. Obviously, if the Board concluded at the end of its investigation into the Demands that it would accept instead of refuse them, or further conclude that the evidence uncovered by its investigation was serious enough to warrant a broader and independent investigation into other tax issues (federal and state), it would have done so.

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

considered the fact that even if they had violated their duties the Company's directors were exculpated by Starbucks' Articles of Incorporation from all liability unless they engaged in intentional misconduct or a knowing violation of the law. PEx. C (Resolution) at ¶ M; RCW 23B.08.320. This bolsters the rationality of the Board's decision. *Merrill Lynch*, 773 F. Supp. 2d at 348 (dismissing derivative complaint where board considered the corporation's limited ability to recovery money damages from directors due to exculpation provision).

Not only did the Board conclude that the Company's directors and officers properly exercised their business judgment with respect to the Company's tax policy, the Board also concluded that "it would not be in the best interests of the Company for it to institute litigation or bring claims against any persons for the matters raised in the two Demand Letters." PEx. C (Resolution) at ¶¶ N-P. This also supports the rationality of the Board's decision. *Goodwin*, 19 Wn.2d at 762-63, *Espinoza*, 807 F.3d at 508 (affirming dismissal; pointing to board's statement that litigation regarding the demands was not in the corporation's best interests).

Finally, the Board considered the fact that the Netherlands has appealed the EC Decision, creating doubt as to whether the Starbucks' APA violated EU rules and whether Starbucks truly owes the Dutch for unpaid taxes. PEx. C at ¶ G; Ex G to PEx. C at 14. This doubt further justifies the Board's refusal of the Demand. *Furman*, 2007 U.S. Dist. LEXIS 39618, at *15-16 (holding that Wal-Mart's unresolved appeal from the district court's certification of a labor class action created good reasons for the Wal-Mart board to refuse to pursue legal action against directors related to the labor violations).

Dated: January 19, 2017

s/ Barry M. Kaplan
Barry M. Kaplan, WSBA #8661
Gregory L. Watts, WSBA #43995
Elon Slutsky, WSBA #50104
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500 | Fax: (206) 883-2699
Email: bkaplan@wsgr.com
Email: gwatts@wsgr.com
Email: eslutsky@wsgr.com

*Attorneys for Defendants*

NOMINAL DEFENDANT'S MOTION TO DISMISS COMPLAINT   -24-
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500

# **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2017, I filed the foregoing with the Clerk of the Court using the CM/ECF system, and served all parties via ECF.

Dated: January 19, 2017

s/ Barry M. Kaplan
Barry M. Kaplan, WSBA #8661

CERTIFICATE OF SERVICE
CASE NO.: CV16-1580-RAJ

WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699